**In the Matter of CYR BROTHERS MEAT PACKING, INC., Debtor in Possession.**

**Bankruptcy No. BK78–53ND.**

United States Bankruptcy Court, D. Maine.

Feb. 7, 1980.

---

**28.** The amount due on that mortgage has not been established in this proceeding.

P. Benjamin Zuckerman, Verrill & Dana, Portland, Me., for Creditors' Committee.

James A. Goodman, Goodman, Goodman & Kornreich, Bangor, Me., for debtor.

## MEMORANDUM OPINION

CONRAD K. CYR, Bankruptcy Judge.

Cyr Brothers Meat Packing, Inc. [the Company], debtor in possession, has submitted a plan of arrangement for confirmation by the court following its acceptance by creditors. The Company simultaneously requests authorization to compromise various claims and causes of action, and authorization to sell certain real and personal property. The approval of these requests is essential to the implementation of its proposed arrangement.

Cyr Brothers Meat Packing, Inc. operates a wholesale food distribution business [Brothers Division] and owns a potato processing plant [Food Division]. Since the commencement of the Chapter XI case the potato processing plant has not been operated, except during a brief interval for the processing of fish. The wholesale food distribution business has continued to operate throughout the proceedings. Despite the profitability of the Brothers Division, the Company became mired in insolvency due to its debt-burdened and unprofitable processing plant. Therefore, the basic rehabilitation scheme calls for the abandonment of the Food Division and retention of the Brothers Division.

The proposed plan of arrangement, a purchase-sale agreement and a compromise agreement, known as the August 24 Agreement, between the debtor in possession and various other parties, are interdependent. Under the proposed purchase-sale agreement with William Daigle, the potato processing plant and its waste treatment facility would be sold to Daigle for $900,000, which would be turned over to the Northern National Bank in part payment of a first mortgage lien on the potato processing plant and a first security interest covering its contents, guaranteed by the Maine Guarantee Authority [M.G.A.]. The Daigle purchase would be financed through a direct $700,000 Economic Development Administration [E.D.A.] loan, a $250,000 direct loan from Northern Maine Regional Planning Commission and a $250,000 loan from Northern National Bank guaranteed by the Small Business Administration [S.B.A.]. Northern National Bank and M.G.A. have agreed to accept $950,000 in full satisfaction of a Company note in the original amount of $1,500,000, on which is claimed a principal and interest balance exceeding $1,924,-000, secured by a first real estate mortgage and a first security interest in the potato processing plant and its equipment. The remaining $50,000 due Northern National Bank and M.G.A. would be paid by the Company from the proceeds of a new Northern National Bank loan.

The Brothers Division would assume much of the present Company indebtedness following confirmation. The S.B.A. would agree to release its secured claims against the potato processing plant and its pollution treatment facility in return for the assumption by the Brothers Division of three S.B.A. loans, totaling approximately $1,170,000, secured by a first mortgage on the Brothers Division real estate and a first security interest in the machinery, vehicles and equipment retained by the Brothers Division.

The physical assets retained by the Company following confirmation would have an approximate value of $1,385,000, but would be subject to liens totaling $1,421,835. The arrangement would be funded in large measure through loan extensions and moratoria. The three S.B.A. loans would be extended. The Northern Maine Regional Planning Commission would lend the Company $250,000 at 7%, the proceeds to be used to satisfy postpetition borrowings from the Northern National Bank, to provide necessary working capital, and to enable a $100,000 contribution to the Unsecured Creditors Fund. The Northern National Bank would lend the Company $150,-000 with interest at 2% over Boston prime, of which $100,000 would be deposited in the Unsecured Creditors Fund and $50,000 would satisfy the balance due Northern National Bank and M.G.A. on their $950,000 potato processing plant settlement.

The Debtor's Amended Plan of Arrangement divides claims into three separate classes. Class 1 consists of priority, post-petition-indebtedness and cost-of-administration claims, to be satisfied in full. Class 2 consists of the claims of Company insiders and relatives, which are to receive no dividend. Class 3 consists of general unsecured claims held by non-insiders, which are to receive a cash dividend, estimated by the Creditors' Committee at between 12.5% and 15%, and a possible supplemental dividend from any net recoveries realized in the litigation of various causes of action to be transferred by the Company to the Creditors' Committee. No minimum dividend is proposed for class 3 claim holders. Any dividend on class 3 claims is to come from the Unsecured Creditors Fund, after payment of all costs of administration, postpetition indebtedness and priority claims, as well as certain other deductions.

The Unsecured Creditors Fund would consist in part of $266,000, including $200,-000 contributed by the Company from new loan proceeds, a $48,750 cash contribution by the Northern National Bank and $17,250 resulting from the reduction of various priority claims. The arrangement proposes that an additional $80,000 would be deposited in the Unsecured Creditors Fund from miscellaneous monies claimed by the Com-

pany.[1] The Company agrees to assign various causes of action [2] to the Creditors' Committee, which the Committee, in its sole discretion, may pursue after confirmation for the benefit of class 3 creditors. Whatever recoveries might be realized on these causes of action would be reduced by the fees and expenses of the Creditors' Committee, its accountant, if any, its attorney, as well as the fees and expenses of counsel for the debtor. Any such recoveries would then first be applied to maintain the "Security Fund" at the required minimum level.

Under the August 24 Agreement among the Company, its principals, Northern National Bank, the Creditors' Committee, S.B.A. and M.G.A., there is created a "Security Fund" consisting of an Indemnification Escrow and a Supplementary Escrow. The monies to be escrowed would derive from the net proceeds of the liquidation of certain inventory, accounts receivable and equipment of the Company. The "Security Fund" would be established to provide a minimum of $25,000 with which to indemnify Casco-Northern Corporation, Caso Bank & Trust Company, Northern National Bank, against losses sustained by them as a result of third-party actions precipitated by Credi-

tors' Committee litigation of causes of action brought in behalf of class 3 creditors. The Unsecured Creditors Fund and any recoveries realized by the Creditors' Committee in litigation against third parties would be called upon as required to maintain the "Security Fund" at the $25,000 level.[3]

In return for various lending commitments and a $48,750 cash contribution from Northern National Bank, the Company and the Creditors' Committee propose that the order of confirmation formally recognize the validity and enforceability of the secured claims of the Northern National Bank, the M.G.A. and the S.B.A. A general description of potential challenges to the validity and enforceability of the secured claims of Northern National Bank, M.G.A. and S.B.A. was provided to the court by counsel for the Creditors' Committee and has been impounded, until further order of court, at the request of the Creditors' Committee. The information contained in that communication, while far from complete, points to the existence of substantial legal and equitable objections to the validity and enforceability of these claims.[4]

■ A proposed Chapter XI arrangement must comply with each of the requirements

1. It is unclear on the present record whether there are any competing claims to these monies. It is also unclear how much any of these monies would add to recoveries by class 3 creditors, since it would appear that these monies, to the extent free of competing claims under Chapter XI, would also constitute assets of the estate in any liquidation proceeding.

2. These causes of action consist of twenty-five to thirty possibly preferential transfers, as well as objections to certain unsecured proofs of claim. The Creditors' Committee would also acquire from the debtor causes of action against Cumberland Cold Storage, a warehouseman of the Company's frozen potato product. But the court is advised that the Creditors' Committee has agreed not to proceed on any such causes of action if to do so would precipitate a third-party action against Casco-Northern Corporation, Casco Bank & Trust Company, Northern National Bank, though no mention of any such understanding appears in the proposed arrangement, the August 24 Agreement, the creditor acceptance so-

licitation letter or the impounded communication from counsel for the Creditors' Committee.

3. It bears emphasis that class 3 creditors are in this manner underwriting the legal costs and liability of Casco-Northern Corporation, Casco Bank & Trust Company, Northern National Bank, arising out of any litigation which may be brought against those parties to redress conduct of which class 3 creditors were only the innocent victims. The more far reaching and culpable the prepetition conduct of the indemnitees, the greater the deterrent to pursuing the causes of action acquired by the Creditors' Committee from the Company and the higher the cost in terms of diminished dividends to the innocent indemnitors.

4. The same legal and equitable grounds for challenging these secured claims presumably prompted the creation of the "Security Fund" through which class 3 creditors are to provide indemnification to the secured claimants against any costs and liability incurred by them in third-party actions. *See* note 3 *supra.*

of section 366 [5] in order to qualify for confirmation. Instead, in my judgment the proposed arrangement complies with none of the criteria for confirmation.

While the arrangement appears to have been accepted by creditors,[6] there is considerable uncertainty as to the adequacy of the disclosure to creditors respecting certain provisions of the plan, which leaves the operative validity of the acceptances open to question. The plan promises no minimum dividend to creditors. The Unsecured Creditors Fund is subject to total depletion, if necessary, to assure payment in full of the costs of administration, postpetition indebtedness and priority claims, including counsel fees during the Chapter XI proceedings and those incurred after confirmation by the debtor and by the Creditors' Committee. The Unsecured Creditors Fund is also subject to depletion as required to replenish the "Security Fund".[7] With no limitation on costs of administration and no minimum dividend proposed for class 3 creditors, the court is more inclined to the view that the proposed arrangement was not accepted on a sufficiently informed basis, than that creditors have chosen to eschew self-interest in such uncharacteristic

fashion. In support of this view is the fact that neither the plan itself nor the Creditors' Committee letter soliciting acceptances discloses that the Unsecured Creditors Fund is subject to depletion to whatever extent allowable costs of administration, including counsel fees, exceed $92,000.[8]

These disclosure concerns are exemplified by the great difficulty the court has experienced in attempting to glean the exact nature of the understandings among the parties from no less than four sources viz., the proposed arrangement, the August 24 Agreement, the October 11, 1979 letter from the Creditors' Committee to unsecured creditors, and the impounded communication from Creditors' Committee counsel to the court. For instance, a reasonable reading of the proposed arrangement itself would lead to the conclusion that the Unsecured Creditors Fund is only subject to a $6,000 deduction for the cost of constructing a common wall, since that is the only item mentioned in Article III, C. of the proposed arrangement, entitled 'Charges Against the [Unsecured Creditors] Fund'. The facts of this case do not warrant indulging a presumption [9] that the proposed

---

**5.** "Sec. 366. The court shall confirm an arrangement if satisfied that—
(1) the provisions of this chapter have been complied with;
(2) it is for the best interests of the creditors and is feasible;
(3) the debtor has not been guilty of any of the acts or failed to perform any of the duties which would be a bar to the discharge of a bankrupt; and
(4) the proposal and its acceptance are in good faith and have not been made or procured by any means, promises, or acts forbidden by this Act.
Confirmation of an arrangement shall not be refused solely because the interest of a debtor, or if the debtor is a corporation, the interests of its stockholders or members will be preserved under the arrangement." Bankruptcy Act § 366, 11 U.S.C. § 766.

**6.** *See* Bankruptcy Act § 362(1), 11 U.S.C. § 762(1). Among 182 class 3 creditors, 129 accepted by giving their proxies to the Creditors' Committee and 50 did not accept. The 129 acceptances represented 72.06% of all class 3 claims and 68.82% of the amount of such claims. Only 3 class 3 creditors individually accepted the proposed arrangement.

**7.** The Unsecured Creditors Fund is subject to a further $17,250 diminution as a result of reductions in priority claims, as well as a decrease of $6,000 to defray the cost of a common wall to be constructed between the Food Division and the Brothers Division real estate. The $6,000 item is disclosed in the plan, whereas the $17,250 item is reflected in the August 24 Agreement.

**8.** The proponents of the arrangement project a 12.5% to 15% dividend to class 3 creditors from the Unsecured Creditors Fund, provided professional fees and expenses do not exceed $92,000. The court is informed by counsel for the Creditors' Committee that requests for counsel fees will approximate $125,000. Accounting fees already incurred approximate $21,000. These increases in costs of administration alone would reduce the dividend payable to class 3 creditors from the Unsecured Creditors Fund to approximately 7.5%.

**9.** Where no objection to confirmation is timely filed, the court *may* find, without taking proof, that the plan has been proposed and its acceptance procured in good faith. *See* Rule of Bankruptcy Procedure 11–38(d).

arrangement and its acceptance comply with the requirements of subsections 366(1) [10] & (4).[11]

The deposit required to cover costs of administration, including postpetition indebtedness, has not been made.[12] The proposed arrangement purports to dispense with the deposit of funds to cover debts incurred during the Chapter XI proceedings,[13] but no waivers of deposit from postpetition claimants have been filed as required by law.[14] Absent the required deposit or waivers confirmation is not in order [15] under section 366(1).[16]

Nor is the court satisfied that it is in the best interests of creditors to concede the validity and enforceability of the large secured claims held by Northern National Bank, M.G.A. and S.B.A., which may be subject to reduction, equitable subordination, avoidance or disallowance. Furthermore, the proposed abandonment of related causes of action against these lenders and guarantors may not be in the best interests of creditors. The potential recoveries from such causes of action could exceed the entire unsecured indebtedness of the Company. On the basis of the limited information available to the court it is not possible to evaluate the merits of these causes of action. It would have been utterly impossible for individual creditors to have done so before submitting their acceptances, because the information needed for that purpose has never been disclosed to creditors.[17]

The "best interests of creditors" test requires a finding, irrespective of the acceptance of the arrangement by creditors under section 362(1),[18] that recoveries by creditors under the arrangement would equal those in liquidation.[19] No such finding is possible here. There are secured claims in excess of the value of all property of the debtor, which may or may not be enforceable against a trustee in bankruptcy. The Company has causes of action against financially responsible parties involving potential recoveries far in excess of the entire unsecured indebtedness of the Company.[20] Hundreds of thousands of dollars in claims against the estate may be subject to reduction, subordination or disallowance. The court is sufficiently informed concerning these matters to be satisfied that the risks, expenses and delays of litigating these claims and contesting the enforcement of liens do not warrant their abandonment in

---

**10.** In order to satisfy the requirements of § 366(1), the arrangement must comply with all provisions of Chapter XI, including acceptance of the arrangement in writing by creditors as provided in § 362(1). *See* Bankruptcy Act §§ 357(1) & 362(1), 11 U.S.C. §§ 757(1) & 762(1).

**11.** It has been held that in a closely analogous context that full disclosure is "the very elementary obligation" imposed by the requirement of good faith. *See American United Mutual Life Insurance Co. v. City of Avon Park*, 311 U.S. 138, 145, 61 S.Ct. 157, 161, 85 L.Ed. 91 (1940) [Chapter IX]. Bankruptcy Act § 366(4) mandates that the Chapter XI arrangement "and its acceptance" be in good faith. Bankruptcy Act § 366(4), 11 U.S.C. § 766(4). *See* note 9 *supra*.

**12.** *See* Rule of Bankruptcy Procedure 11–38(a)(2).

**13.** "No deposit need be made in respect to any or all such debts whether or not extended as the working capital financing arrangements of the debtor are sufficient and intended to pay such debts." Article V, Provisions for Payment of Debts Incurred During Pendency of Arrangement, Debtor's Amended Plan of Arrangement, filed August 24, 1979.

**14.** *See* Rule of Bankruptcy Procedure 11–38(a) & (b).

**15.** *See id.*

**16.** Bankruptcy Act § 366(1), 11 U.S.C. § 766(1).

**17.** At the request of the court and after the hearing on confirmation, a general description of the nature of these causes of action was made available to the court by counsel for the Creditors' Committee. At the request of the Creditors' Committee, that information was impounded until further order of court.

**18.** *See Technical Color & Chemical Works, Inc. v. Two Guys From Massapequa, Inc.*, 327 F.2d 737, 741 (2d Cir. 1964).

**19.** *See Adler v. Jones*, 109 F. 967, 969 (6th Cir. 1901) [former Chapter 12].

**20.** *See Technical Color & Chemical Works, Inc. v. Two Guys From Massapequa, Inc.*, 327 F.2d 737, 739, 741 (2d Cir. 1964); *Farkas v. Katz*, 54 F.2d 1061–62 (5th Cir. 1932).

return for the precarious proposal that class 3 creditors receive whatever may remain of the Unsecured Creditors Fund.

The failure to propose a minimum dividend to class 3 creditors means that the court must appraise the proposed arrangement under section 366(2) as one promising no dividend. It would not be responsible for the court to conclude that a proposal to abandon millions of dollars in potential recoveries against financially responsible parties, but promising no dividend to creditors in return, is in the best interests of creditors. A liquidation proceeding in which such recoveries are pursued and secured claims are challenged may well prove more beneficial, despite its costs, delays and uncertainties.

Section 366(3) of the Bankruptcy Act directs that the court confirm an arrangement if satisfied that the debtor is not guilty of any act which would bar a discharge under Bankruptcy Act § 14c. There are several respects in which it appears that the debtor may have been guilty of conduct proscribed by section 14c, conduct dealt with by subsection 14c(4) in particular. Bankruptcy Act § 14c(4) bars a discharge in bankruptcy if the debtor, within one year before bankruptcy, has transferred any of its property with intent to hinder, delay or defraud creditors.[21] The court is not satisfied that the debtor has not transferred property with intent to hinder, delay or defraud creditors.

The Chapter XI petition was filed on March 13, 1978. Within the preceding one-year period, Alban Cyr, Sr., President of Cyr Brothers Meat Packing, Inc., received at least $16,896.75 and Irvin Cyr, Secretary-Treasurer, received at least $28,000 from the Company. While it may be arguable that the amounts received by Alban Cyr, Sr. were loan repayments, there is no basis on the present record for treating the $28,000 received by Irvin Cyr as anything other than a fraudulent transfer,[22] since it appears to have been made without any consideration whatever. *See, e. g., In re Greenberg,* 46 F.Supp. 289, 290–91 (E.D.N.Y.1942).

■ Finally, there is one absolute prerequisite to confirmation in every Chapter XI case. Notwithstanding acceptance of a plan by all creditors,[23] no Chapter XI arrangement may be confirmed unless the court is satisfied that the plan and its acceptance are in good faith,[24] within the meaning of section 366(4).

"Broadly speaking, the basic inquiry should be whether or not under the circumstances of the case there has been an abuse of the provisions, purpose or spirit of Chapter XI in the proposal or acceptance of the arrangement."[25]

■ *Full* disclosure is the very essence of the obligation imposed by the requirement of good faith. *American United Mutual Life Insurance Co. v. City of Avon Park,* 311 U.S. 138, 145, 61 S.Ct. 157, 161, 85 L.Ed. 91 (1940). [Chapter IX]. The court has already discussed certain respects in which disclosure appears to have been deficient in this case.

■ The court has serious misgivings about the alliances forged and the arrangement reached among the principal parties to the August 24 Agreement. The principals of the debtor Company (and their families), under whose direction and control the Company became insolvent, would be released from personal liability to the Company and to its unsecured creditors, whether resulting from preferential or fraudulent transfers, unfulfilled capital commitments or other legal obligations, in return for

21. *See* Bankruptcy Act § 14c(4), 11 U.S.C. § 32c(4).

22. *See* Bankruptcy Act § 67d(2), 11 U.S.C. § 107d(2).

23. 9 *Collier on Bankruptcy* ¶ 9.20 (14th ed. 1975) at 318.

24. "Good faith" under § 366(4) has to do with the arrangement itself and its acceptance, and not with the debtor's behavior prior to the petition. *In re Nathanson,* 50 Am.Bankr.R. (n.s.) 465, 471 (Ref.D.S.D.Ind.1941).

25. 9 *Collier on Bankruptcy* ¶ 9.20 (14th ed. 1975) at 319.

their release of claims against the estate which may be subject to reduction, subordination or disallowance. In return for releasing Northern National Bank, S.B.A., M.G.A. and others from liability to them and to the Company and its creditors, the principals of the Company (and family) would remain in control of the profitable Brothers Division.[26]

The Creditors' Committee, on the other hand, in return for a possible dividend of an undetermined minimum amount to unsecured creditors would release the principals of the Company and all family members from liability, even for apparently fraudulent transfers, viz., $28,000 to Irvin Cyr, and release Northern National Bank and others from any liability on account of business conduct sufficiently disconcerting to have prompted impoundment of its mere description. It is far from evident in these circumstances that "the elementary obligation of full disclosure" has been met. *See American United Mutual Life Insurance Co. v. City of Avon Park*, 311 U.S. 138, 145, 61 S.Ct. 157, 161, 85 L.Ed. 91 (1940).

■ It is the duty of the court to prevent any use of the reorganization process that is contrary to the purpose and spirit of Chapter XI.[27] Congress has again recently made it abundantly clear by its enactment of the Bankruptcy Code that reorganization under the bankruptcy laws requires *full* disclosure.[28] While it may have seemed expedient in these circumstances to use Chapter XI as a convenient vehicle for the adjustment of disputes among the principal parties to the reorganization process, the bankruptcy court cannot condone compromise settlements or confirm a plan of arrangement absent full disclosure and a sufficient showing that the arrangement and its acceptance comport with the salutary spirit and the equitable purposes of the bankruptcy laws.

The proposed arrangement is denied confirmation, the application to compromise is dismissed and the application to sell is disapproved.

This memorandum opinion constitutes the court's findings of fact and conclusions of law.

---

**26.** The fact that the interests of stockholders of the debtor are preserved under the arrangement is not alone sufficient to warrant withholding confirmation of an arrangement. *See* Bankruptcy Act § 366, 11 U.S.C. § 766.

**27.** *See* Bankruptcy Act § 366(4), 11 U.S.C. 766(4).

**28.** Section 1125(b) of the Bankruptcy Code prohibits the solicitation of any acceptance of a chapter 11 plan absent the transmittal of a written disclosure statement approved by the court as containing "adequate information."

"'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the

condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . .." Bankruptcy Code § 1125(a), 11 U.S.C. § 1125(a).

The court cannot presume that a reasonable investor would have been able to make an informed judgment as to the arrangement proposed in the present case, since some of the information essential to an informed judgment was never available to creditors and other important information was obscured in its presentation.