**In re HERON, BURCHETTE, RUCKERT & ROTHWELL, Debtor.**

**Bankruptcy No. 91–00697.**

United States Bankruptcy Court,
District of Columbia.

Nov. 17, 1992.

Mark W. Foster, Judith Sturtz Karp, Rosemarie Schmidt, DC, for debtor.

Stephen E. Leach, DC, for James S. Blaszak, John E. Fiorini, III, Grier C. Raclin.

Timothy P. Branigan, DC, Merrill R. Francis, Los Angeles, CA, for Richard P. Molleur.

Gary L. Lassen, pro se.

James E. Carter, pro se.

Lawrence J. Movshin, pro se.

Edward L. Genn, Rockville, MD, for U.S. Leasing.

Ira C. Wolpert, Paul R. Monsees, DC, for Edward A. Allison.

Charles C. Hunter, pro se.

Patrick J. Whittle, pro se.

David Parker, for Vistar Bank.

Alan S. Kerxton, DC, for John Hancock Mut. Life Ins.

Roger Frankel, Bruce Markowitz, DC, for Unsecured Creditors Committee.

## DECISION PROVISIONALLY CONFIRMING DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION AND PROVISIONALLY GRANTING DEBTOR'S MOTION FOR A PERMANENT INJUNCTION

S. MARTIN TEEL, Jr., Bankruptcy Judge.

A hearing under § 1128(a) of the Bankruptcy Code (Code), 11 U.S.C. § 1128(a),

and Rule 3020(b) of the Federal Rules of Bankruptcy Procedure was held before the court on September 14 and 23, 1992, and October 5, 6, 16, 19, 20 and 21, 1992, to consider the confirmation of the Debtor's Second Amended Plan of Reorganization (the plan), filed August 28, 1992, by the debtor in this case, Heron, Burchette, Ruckert & Rothwell (the debtor).

Coupled with these proceedings was a motion for a permanent injunction filed by the debtor on September 16, 1992. The motion was filed in *Heron, Burchette, Ruckert & Rothwell v. Perrault et al.*, Adv. No. 91–0073 (adversary proceeding), an adversary proceeding in which the debtor originally sought a temporary restraining order (TRO) and preliminary injunction enjoining holders of claims or interests in the main case from taking any steps to realize their claims or interests against the partners. Except to the extent otherwise qualified, the term "partner," and its plural form "partners," has the meaning set forth in the plan. The same holds true for any other terms used in this decision.

The court finds that the plan satisfies the requirements of 11 U.S.C. § 1129, except for the minor defects noted *infra*. Thus, the court provisionally confirms the plan conditioned on the debtor curing the defects noted *infra*. When the court is satisfied that the debtor has cured the defects, the court will issue an order confirming the plan.

## FACTUAL BACKGROUND

### I. *General*

The debtor is a partnership of individual and professional corporations (P.C.). Its partners are grouped into two groups, share and non-share partners. In January 1989 a predecessor of the debtor merged with the partnership of Nelson & Harding, P.C. (Nelson & Harding), an established law firm with several offices west of the Mississippi River, to create for the most part the present debtor. At the height of its expansion in 1989, the debtor consisted of approximately 100 partners and employed approximately 235 attorney and non-attorney government relations special-ists in nine offices throughout the United States. These offices were located in Mesa and Phoenix, Arizona; Sacramento, California; Denver, Colorado; Lincoln and Omaha, Nebraska; Rapid City, South Dakota; Austin, Texas; and Washington, D.C.

The debtor experienced financial difficulties in 1989 and also suffered from attrition as many lawyers left the firm. These difficulties culminated in February 1990 when the debtor closed its doors, except for the National Accounting Office in Lincoln, Nebraska, and commenced winding-down its affairs.

The debtor employed its present counsel, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, to help it in its wind-down and in particular in the negotiation of a workout with creditors. In 1990, an Unofficial Creditors Committee was formed. The debtor's efforts to attain a workout ultimately failed, and accordingly, it filed for bankruptcy in this court.

### II. *Procedural Background*

The debtor filed its petition in this court on July 1, 1991. On that same day, the debtor filed its complaint for a TRO and preliminary injunction. The debtor proceeded as debtor-in-possession (DIP) and continues as such today.

A hearing was held on the debtor's request for a TRO on July 8, 1991, and the Court issued a TRO on that day. Hearings were held on the debtor's request for a preliminary injunction on July 27, 28, and 29, 1991, with the court granting such relief on July 29, 1991. Both the TRO and preliminary injunction enjoined any actions by any interested party against the debtor's partners on claims related to the debtor's affairs.

In August 1991, an Official Committee of Unsecured Creditors (Creditors Committee) was appointed by the court. In addition, the court approved post-petition financing of the debtor's efforts by Vistar Bank, giving the bank a super-priority security interest in the debtor's personal property.

On September 30, 1991, the court held a hearing to show cause why an order should

not be entered under Rule 1007(g) of the Federal Rules of Bankruptcy Procedure requiring full disclosure by all partners of their financial condition, including an accounting of assets and liabilities. Pursuant to the hearing, the court entered an order on October 16, 1991, requiring such disclosure. On February 7, 1992, an order was entered granting the Creditors Committee's motion for a 2004 examination of those partners who did not comply with the production requirements set forth in the order entered October 16, 1991, requiring full disclosure.

The debtor filed a plan of reorganization and disclosure statement on January 17, 1992. Further negotiations broke down, however, and the debtor requested a court supervised settlement conference. The court conducted this settlement conference in May 1992. At this conference the court indicated that it might confirm a plan containing a permanent injunction protecting the partners contributing to the plan from creditors and other partners.

Shortly thereafter, on June 24, 1992, an amended plan of reorganization and amended disclosure statement were filed. The amended plan included a permanent injunction. After a hearing, the court approved the amended disclosure statement on July 13, 1992. On August 28, 1992, the debtor filed the instant plan, the Debtor's Second Amended Plan of Reorganization, and disclosure statement, the Debtor's Second Amended Disclosure Statement.

Prior to confirmation, the following creditors filed objections to confirmation of the plan: BIG D OIL CO; U.S. Leasing, creditor John Hancock Mutual Life Insurance (John Hancock); and landlord DeConcini, McDonald, Brammer, Yetwin & Lacey, P.C. (DeConcini). The following partners also objected: James A. Ullman, Gary L. Lassen, James E. Carter, Kenneth C. Sundloff, Edward P. Taptich, Grier C. Raclin, John E. Fiorini, James S. Blaszak, Richard P. Molleur, Lawrence J. Movshin, Patrick J. Whittle, Charles C. Hunter, and Edward A. Allison. Of the objecting parties, only U.S. Leasing, Raclin, Fiorini, Blaszak, Molleur, Movshin, Carter, Lassen, and Allison still pursue their objections. The objection of BIG D OIL CO was to an inaccuracy in the disclosure statement. To the extent it was an objection to confirmation of the plan, it is hereby overruled.

Edward P. Taptich, a former partner of the debtor, also filed an objection to confirmation of the plan. Taptich was not dealt with in the plan because in February 1992 he filed a chapter 7 bankruptcy case in bankruptcy court in Maryland. Earl H. Scudder, a partner with Nelson & Harding and—after the merger—with the debtor, filed a nondischargeability complaint in Taptich's bankruptcy case. In his complaint Scudder alleged that Taptich and other partners of the debtor fraudulently induced Nelson & Harding to merge with the debtor. Taptich filed motions in this court contesting Scudder's actions, seeking to enforce the court's July 29, 1991 preliminary injunction, and requesting sanctions. Scudder opposed Taptich's motions. At a hearing held October 2, 1992, the Scudder–Taptich matter was addressed, and on October 5, 1992, a settlement resolving the matter was entered on the record.

On the first day of confirmation, the debtor reported the results of the voting. All but one impaired class voted for the plan. Of those voting, only 2 of 63 creditors and 11 of 91 partners rejected the plan. Broken down into class, 100% of Class II accepted, 100% of Class III(A) accepted, 89.5% in number and 99.5% in amount of Class III(B) accepted, 100% of Class III(C) accepted, Classes III(D)(1)–(D)(4) did not vote, 62.5% in number and in amount of Class IV(A) accepted, and 97% in number and in amount of Class IV(B) accepted.[1] At present, the number of creditors rejecting the plan has decreased to 2 and the number of partners objecting has decreased to 8, 6 from Class IV(A) and 2

---

**1.** For voting purposes, claims in Class IV(A) and Class IV(B) were assigned a value of one dollar per claim. Debtor's Memorandum of Law in Support of Chapter 11 Plan of Reorganization and in Opposition to Objections to Confirmation, at 34 n. 15.

from Class IV(B).[2]

Confirmation hearings were held on September 14 and 23, 1992, and October 5, 6, 16, 19, 20, and 21, 1992. During the hearings, the court heard oral argument from the interested parties and heard the testimony of witnesses for the debtor, including the testimony of two expert witnesses. None of the objecting parties put on any witnesses to counter the experts or other witnesses. Instead, these parties relied exclusively on their cross-examination of the debtor's witnesses, exhibits admitted through those witnesses or by stipulation with the debtor, and oral argument. Various procedural objections were raised throughout the proceedings but the court overruled any such objections relevant to the issue of confirmation of the plan. To the extent any such objection was not properly addressed by the court, through oversight or otherwise, it is hereby overruled.

The debtor originally proceeded only in the main case, seeking confirmation of a plan that calls for the court to issue a permanent injunction against participating partners. On September 16, 1992, the debtor filed a motion for a permanent injunction in the adversary proceeding. This matter was consolidated with the confirmation hearing.

## III. *The Plan*

The debtor has divided the claimants into four large groups: administrative expenses and priority claims, secured claims, unsecured claims without priority and malpractice claims, and partner/guarantor claims. Within these groups the claimants are grouped into classes for the purposes of voting and treatment under the plan.

Class I (administrative expenses and priority claims) is not impaired under the plan. Class II (secured claims) is impaired. Class II consists of Vistar Bank's claim.

Classes III(A)—III(D)(4) (unsecured claims) are impaired. Class III(A) consists of administrative convenience claims equal to or less than $1000.00. It includes an opt-in provision for claims equal to or less than $50,000.00. Class III(B) consists of general unsecured claims that do not fall within any of the other Class III and Class IV classes. Class III(C) consists of all allowed landlord recourse claims of Class III(B)—that is, all Class III(B) claims based on real property leases. Classes III(D)(1)–III(D)(4) consists of malpractice claims.

Class IV claims, which are grouped into two classes, are impaired. Class IV(A) consists of claims of partners and guarantors who withdrew before February 1990 while Class IV(B) consists of those who did not so withdraw.

The plan establishes a payout scheme that basically provides pro rata payment of claims within each class in the order a particular class is listed. Thus, Class I is paid first, Class II second, and so on with Class IV(B) paid last. However, Vistar Bank, the sole holder of a Class II claim, has entered into a settlement agreement with the debtor. Under the agreement, the bank has agreed to look only to the debtor's account receivables for payment of certain portions of its claim. There are other variations from the general payout scheme, some of which will be discussed later. The remainder are not important to any confirmation issues.

The plan establishes a general fund for payment of claims in all classes except for the malpractice claims in the classes grouped in Class III(D). Contributions of participating partners fund the general fund. The plan also provides for creation of a malpractice fund for payment of allowed malpractice claims. The malpractice fund is funded from the general fund.

## IV. *Partnership Settlement Agreements and Notes*

The plan's general fund is funded almost exclusively by contributions from participating partners. To participate under the plan and receive the protection of the permanent injunction, each partner is required

---

**2.** The debtor's final creditor balloting report indicates that two creditors still object to the plan. One of these creditors is DeConcini. DeConcini, however, settled with the debtor during the confirmation hearing.

to sign a partnership settlement agreement and a note. Each agreement and note provides for the payment of principal and interest over a ten-year period, with a discount for early payment. The interest rate varies according to whether the partner offers security, a confession of judgment, or only the note itself.

The amount of each contribution was established by the debtor, its partners, and an allocation committee appointed by the debtor and its partners. The contribution amounts were arrived at only after extensive debate and negotiations. In certain cases, the debtor has settled with partners at less than their contribution amount. In large part, the reduced amounts have been made up by increased contributions from other participating partners or the foregoing of fees by counsel for the debtor. In one instance, the Creditors Committee has agreed to forego collection of roughly $35,000.00 in contribution amounts.

At the same time the debtor was negotiating among its partners, it negotiated just as extensively with the Creditors Committee to determine a gross dollar amount in partner contributions acceptable to the committee. In these negotiations, the Creditors Committee utilized the financial statements of the partners and the committee's accountant's analysis of these statements as the basis for determining the gross number. As the give and take occurred between the debtor and the Creditors Committee, the debtor reported to its partners who, in turn, modified the contribution amounts according to various schemes in an attempt to meet the demands of the Creditors Committee while building consensus within itself. The final amount agreed to by the Creditors Committee, and on which confirmation was conditioned, was $4.5 million.

In varying degrees, the contribution amount is based on how long a partner was with the debtor, how much income a partner received from the debtor in 1989, how much income a partner received in 1990 after leaving the debtor, certain defenses to liability, a partner's status as a share or non-share partner, a partner's available net worth, and whether a partner is liable only on a personal guarantee. The contribution amount does not reflect defenses potentially available to Class IV(A) members because they left the debtor before February 1990, nor does it reflect rights peculiar to such a partner because he withdrew early. The contribution amount also does not reflect how much management responsibility a particular partner had, except to the extent he received more remuneration because of such responsibility.

The Nelson & Harding P.C. partners entered into separate negotiations with the Creditors Committee. The negotiations allowed these partners to reduce their respective contribution amounts in exchange for contributing two other assets, some land in Kentucky (Kentucky Land) and the contingent fee recovery in *McCarty Farms, Inc. v. Burlington Northern, Inc.* (Grain Case) which is an active civil action in the United States District Court for the District of Montana.

These assets are expected to become the property of the Nelson & Harding Merger Trust. This trust was formed when Nelson & Harding merged with the debtor's predecessor partnership. The trust holds assets for the benefit of the Nelson & Harding P.C. partners.

The Kentucky land will be sold and, after paying $50,000.00 to the Lincoln, Nebraska landlord, applied in full to the general fund. The Nelson & Harding P.C. partners have provided the Creditors Committee a $75,000.00 guarantee with respect to this land.

The first million dollars of any recovery from the Grain Case will be deposited in the Nelson & Harding Merger Trust. Of that amount, the trust will deposit $850,000.00 in the general fund. The Nelson & Harding P.C. partners have provided the Creditors Committee a $100,000.00 put for the first $200,000.00 of potential proceeds from the Grain Case as part of their contribution of that asset.

The debtor's Second Amended Plan Funding Analysis indicates that 84 of 100 partners have executed settlement agreements and notes. This results in a gross promised contribution amount of $4,977,-

807.61 out of a possible $6,792,723.08. The gross promised contribution amount does not include the value of the Kentucky land or the Grain Case, both of which the Creditors Committee had agreed to count to the $4.5 minimum for confirmation of the plan. If amounts attributable to these assets are included, the gross promised contribution amount climbs to $5,902,807.61.

During the confirmation hearing, it was established that certain of the partnership settlement agreements and notes had been altered. The court has not examined these notes but has provided for a mechanism to resolve any potential disputes in Section IV.C, *infra.*

## V. *Permanent Injunction*

The plan has as a condition precedent to its consummation that the court enter a final order confirming the plan which contains a permanent injunction. The permanent injunction protects the participating partners from suits from creditors and other partners. Related to this feature are certain releases and a covenant not to sue. Under the plan every vote to accept the plan results in the release of the participating partners from any claim related to the debtor's affairs. In addition, Vistar Bank covenants not to sue the participating partners who satisfy their obligations under the plan.

As is discussed more fully in Section V, the injunction is the *sine qua non* of the plan. Various participating partners testified that they would have no incentive to make large contributions to the plan if they remained liable outside the plan for claims related to the debtor's affairs.

The injunction is also essential to provide maximum payout and fair distribution under the plan. The absence of an injunction would result in extensive litigation and personal bankruptcies for many partners. Many smaller creditors would not be able to maintain their claims as it would not be worth the cost. Thus, the entry of the permanent injunction benefits all the creditors being enjoined and is consistent with the Code's goal of maximizing return on a collective basis to all creditors.

## COMPLIANCE WITH THE BANKRUPTCY CODE

The court finds that all the elements of 11 U.S.C. § 1129 of the Code have been satisfied by the debtor, except as noted in the discussion section that follows. Thus, the debtor has demonstrated to the satisfaction of the court that the following have been met or can easily be met by meeting the concerns of the court as expressed in the discussion section that follows:

(1). the Plan complies with the applicable provisions of the Code;

(2). the debtor, as the plan proponent, has complied with the applicable provisions of the Code;

(3). the plan has been proposed in good faith and not by any means forbidden by law;

(4). all payments made or to be made by the debtor for services or for costs and expenses in or in connection with this case, or in connection with the plan and incident to this case, have been approved by, or are subject to the approval of, the court as being reasonable;

(5). the debtor, as the plan proponent, has disclosed (a) the identity and affiliations of the sole individual who is proposed to serve after confirmation of the plan as a director, insider, or voting trustee of the debtor (i.e., no one), and (b) the identity of any insider that will be employed or retained by the reorganized debtor (i.e., Kermit A. Brashear, who will perform services for the debtor), and the nature of any compensation for such insider ($150.00/hr.)

(6). there are no governmental regulatory commissions with jurisdiction over the rates of the debtor, and therefore, § 1129(a)(6) of the Code does not apply;

(7). each holder of a claim or interest in an impaired class has accepted the plan or will receive or retain under the plan on account of such

claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Code on such effective date;

(8). with respect to each class of claims or interest, except Class IV(A), such class has either accepted the plan or is not impaired under the plan;

(9). except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides for the treatment of administrative expenses and priority claims in accordance with § 1129(a)(9);

(10). at least one class of non-insider claims that is impaired under the plan has accepted the plan;

(11). the plan is feasible and generates sufficient funds to (1) effectuate the liquidation of the debtor in accordance with the provisions of the plan and (2) make those distributions that are required under the plan;

(12). all fees payable under 28 U.S.C. § 1930, as determined by the court at the hearing, have been paid or the plan provides for the payment of all such fees on the effective date of the plan;

(13). there are no retiree benefits (as defined in 11 U.S.C. § 1114) which the debtor is obligated to pay, and therefore, § 1129(a)(13) does not apply; and

(14). the debtor has shown that it is able to satisfy the cram down standards set forth in 11 U.S.C. § 1129(b) with respect to Class IV(A) since the plan does not discriminate unfairly, and is fair and equitable in all respects including the § 1129(b)(2) requirement that no junior class or interest receive or retain any property on account of such junior claim or interest, with respect to Class IV(A) claims.

The following discussion elaborates on the above determinations focusing on those aspects of the determinations which were contested by the parties objecting to confirmation of the plan.

## DISCUSSION

### I. *Contentions of the Objectors*

The objectors remaining are United States Leasing (USL), Edward A. Allison, James S. Blaszak, John E. Fiorini III, Grier C. Raclin, Richard P. Molleur, Lawrence J. Movshin, Gary L. Lassen and James E. Carter. With the exception of USL, Lassen, and Carter, the objectors are members of Class IV(A) consisting of those partners or guarantors of the debtor who left the debtor before February 1990. With the exception of Edward A. Allison, the Class IV(A) objectors are former partners of the debtor. Allison is a "Government Relations Specialist" who personally guaranteed various loans to Vistar Bank. Lassen and Carter, neither of whom pursued their objections at the confirmation hearing, are members of Class IV(B) consisting of those partners or guarantors who remained with the debtor through February 1990. USL is a member of Class III(B) which consists of unsecured creditors with allowed claims exceeding $50,000.00.

Although the objectors voice different objections to the plan, it is most convenient to refer to a particular objection as being raised by the objectors as a whole even though it may, or may not, have been voiced by more than one objector. Therefore, a reference to the "objectors" does not necessarily mean that every objector raised the particular objection referenced.

The objectors raise the following objections. First, they assert that the plan violates 11 U.S.C. § 1129(a)(1) because it places different claims in the same class in violation of 11 U.S.C. § 1122(a). Section 1129(a)(1) is further violated, they urge, because the plan accords unequal treatment to claims within Class IV(A) and therefore the plan fails to comply with 11 U.S.C. § 1123(a)(4).

The objectors further allege that the plan violates § 1129(a)(1) because its permanent injunction is inconsistent with the Code and this contravenes 11 U.S.C. § 1123(b)(5). Moreover, they contend, the court lacks the power under 11 U.S.C. § 105(a) to issue the permanent injunction called for in the plan. The objectors point to two bases for their assertion that the issuance of the plan's injunction is inappropriate. First, they assert that the terms of the injunction are inconsistent with the Code as the terms violate 11 U.S.C. § 524(e) by discharging non-debtors and 11 U.S.C. § 523 by insulating the participating partners from fraud claims. In addition, the objectors maintain that the court lacks power to issue the injunction because such issuance would nullify the partners' state law rights to contribution, *see* D.C.Code Ann.Ann. §§ 41–117, 41–139, 41–304; Neb.Rev.Stat. §§ 67–318, 67–340, and to reimbursement or indemnification, *see* Bromberg & Ribstein, *Partnership*, § 7.14 at 7:154 nn. 33–34 (1988 ed.).

The objectors aver that the plan was not proposed in good faith in violation of 11 U.S.C. § 1129(a)(3). Further, the lack of good faith and the lack of fairness precludes the court from exercising its power under § 105(a) should the court determine that it has the power to issue a permanent injunction.

The objectors contend that the plan fails to comply with the "best interest of creditors" test found in 11 U.S.C. § 1129(a)(7) such as to preclude confirmation.

Notwithstanding the settlements the debtor reached with Class IV(A) members during the confirmation hearing, Class IV(A) has not automatically accepted the plan: no request to change the voting was made on notice and hearing under F.R.Bankr.P. 3018(a) and it is not clear that any such request would be granted. *See In re MCorp Fin., Inc.*, 137 B.R. 237, 238–39 (Bankr.S.D.Tex.1992) (F.R.Bankr.P. 3018(a) permits change in vote only for cause), *appeal dismissed and remanded,*

139 B.R. 820 (S.D.Tex.1992). *But see In re Poteet Constr. Co.*, 122 B.R. 616, 619–20 (Bankr.S.D.Ga.1990). Therefore, 11 U.S.C. § 1129(a)(8) has not been met and resort must be had to 11 U.S.C. § 1129(b). The objectors maintain that the requirements of 11 U.S.C. § 1129(b) have not been met. They do not assert that § 1129(b)(2) has not been met but that the plan otherwise fails to meet the "fair and equitable" and no "unfair discrimination" standards found in § 1129(b)(1). Therefore, according to the objectors, confirmation is precluded.

According to the objectors the plan fails to comply with 11 U.S.C. § 1129(a)(11) as it is not feasible because there has been no showing that the contributing partners can meet their contribution payments under the plan. Accordingly, the plan will not be adequately funded and the reorganization will fail to meet its objectives necessitating further reorganization or liquidation.

## II. Classification and Treatment of Claims

### A. Classification of Claims

■ The objectors assert that the plan violates § 1122(a)[3] by placing different claims in Class IV(A), the class of partners and guarantors who left before February 1990. They contend that their defenses to liability for partnership debt are distinct, as are their claims against the partnership and against the partners who withdrew later (or have not yet withdrawn) in the event they are found liable for any partnership debt. With respect to claims, they observe that a withdrawing partner is only a surety of the continuing partnership and (1) has a right of reimbursement from the partnership and, (2) if the partnership is unable to make reimbursement, has a right of recovery from those partners who elected to continue the partnership. *See* Bromberg & Ribstein, *Partnership*, § 7.14 at 7:154 nn. 33–34 (1988 ed.). Thus, a partner who left the partnership in May 1989 has defenses and claims distinct from those of

---

**3.** 11 U.S.C. § 1122(a) provides:
Except as provided in subsection (b) of this section a plan may place a claim or interest in

a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

a partner who left in December 1989. Similarly, a government relations specialist has defenses and claims distinct from those possessed by withdrawn partners. According to the objectors, each objector should be placed in a class consisting only of those claimants with substantially similar defenses and claims.

■ Section 1122(a) requires only that claims in a class be substantially similar, not identical. The requirement of similarity applies to claims against the estate, not to defenses that holders of claims in the class may have to creditor claims. The members of Class IV(A) have substantially similar claims in that they allege various facts which have a substantially similar effect—to allow recourse directly against the debtor for reimbursement or indemnification. That the claims arise from different facts does not warrant separate classification. What is crucial is whether the claims in a class "share common priority and rights against the debtor's estate." *In re Greystone III Joint Venture*, 948 F.2d 134, 139 (5th Cir.1991). That test is met here as the claims against the debtor's estate alleged by Class IV(A) members are all claims for reimbursement or indemnification. As such, the claims possess the same legal attributes and share common priority against the estate. That an earlier withdrawing partner may have rights of recovery from a later withdrawing partner does not alter the common rank of their claims against the estate.

■ Moreover, to the extent Class IV(A) members allege different claims against the continuing partners, that provides no basis for separate classification. In classifying claims "the focus of the classification is the legal character of the claim as it relates to the *assets of the debtor*." *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C.Cir.1986) (emphasis added). The claims of the Class IV(A) members do not differ with respect to the assets of the

debtor. Therefore, separate classification is unnecessary. *Id.* at 1150–51.

Moreover, even if each dissenting Class IV(A) member's claim were separately classified, the plan could still be confirmed under 11 U.S.C. § 1129(b) against the member's separate class for reasons that will be apparent in the remaining discussion. Thus, the claims in Class IV(A) share the same characteristic of being subject to "cramdown" under § 1129(b) and that is an additional reason to view them as properly classified in a single class.

B. Treatment of Claims

■ The objectors contend that the Class IV(A) members have been subjected to unequal treatment of their claims in violation of § 1123(a)(4).[4] First, they allege that the debtor reached individual settlements with many of the class members. These settlements resulted in a substantial discount of the contribution amount established by the allocation committee. By providing some Class IV(A) members discounts while refusing to provide discounts to other Class IV(A) members, the objectors argue, the plan provides unequal treatment of claims.

Citing *In re AOV*, 792 F.2d at 1151–54, the objectors further maintain some Class IV(A) members are required to tender more valuable consideration than other class members in exchange for the same recovery and protection under the plan. The objectors assert that after withdrawing from a partnership, a former partner is liable only as a surety for partnership debt. As such, the withdrawn partner will be able to obtain reimbursement or indemnification from the partnership for any partnership debt the withdrawn partner is required to pay. Based on their understanding of partnership law, the objectors assert that the value of their reimbursement or indemnification claims against the debtor varies according to when they left the debtor. However, they argue, irrespective of the differences inherent in the partners'

---

4. *11 U.S.C. § 1123(a)(4) provides that a plan shall—*

(4) provide the same treatment for each claim or interest of a particular class, unless the

holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

claims, the plan accords them the same treatment and under *AOV* this constitutes unequal treatment. The objectors therefore claim the plan violates § 1123(a)(4).

For reasons developed below, the court will overrule these objections. Nevertheless, the plan does technically violate § 1123(a)(4), although the violation will have no practical consequence because everyone agrees that it is virtually certain that trade creditors entitled to full payment ahead of Class IV(A) will never be paid in full. Section 3.22 of the plan provides that participating partners and guarantors with Class IV(A) claims will receive a distribution at such time, if ever, that Class I(A), I(B), II, III(B), III(C), III(D)(1), III(D)(2), III(D)(3) and III(D)(4) claims have been paid in full and holders of Class III(A) claims have been paid 25% of each such claim. In contrast, under § 3.24 of the plan, non-participating and defaulting participants with Class IV(A) claims "shall receive Distributions from all remaining available cash only after all Allowed Claims, except for the Class IV(B) Allowed Claims, have been paid in full, and except that Class III(A) shall receive twenty-five percent (25%) of their Allowed Claim." Thus, participating Class IV(A) partners will be entitled to receive a distribution ahead of non-participating Class IV(A) partners. This is unequal treatment of members of the same class.

No one has focused on this specifically, for apparent good reason: all agree that the distribution rights of Class IV(A) are worthless. Nevertheless, there is a theoretical chance that Class IV(A) might receive a distribution. The court doubts that any partners placed any weight on this theoretical right in deciding to participate in the plan and the court doubts that the debtor cares whether the discriminatory treatment is upheld. The court will require the debtor to obtain from each participating partner (and guarantor) an agreement to receive distributions simultaneously on a pro rata basis with the non-participating Class IV(A) partners (and guarantors) and defaulting participants.

If the plan is thus amended, the holders of a Class IV(A) claim or interest will be accorded the same distribution treatment regardless of whether they elect to contribute to the plan. The plan will then provide that Class IV(A) non-participating partners receive distributions in the same amount and at the same time as Class IV(A) participating partners. Thus, the contribution amount allocated to each Class IV(A) member will have no bearing on their distribution rights under the plan.

Similarly, the non-participating partners are entitled to recover from the plan's fund regardless of whether they release their claims against the participating partners. This feature of the plan avoids the classification problem that arose in *AOV*. In that case, the creditors were required to release any claims against the nondebtor plan funders in order to participate in the plan. *AOV*, 792 F.2d at 1143. A creditor objected to the plan under § 1123(a)(4) on the grounds of unequal treatment. The creditor alleged that to participate under the plan it was required to release a unique direct claim against the nondebtor plan funders. The court upheld the objection, explaining—

> It is disparate treatment when members of a common class are required to tender more valuable consideration—be it their claim against specific property of the debtor or some other cognizable chose in action—*in exchange for the same percentage of recovery. . . .* [T]o the extent that the creditor was called upon to release a unique, direct claim *in order to participate in the $3 million Fund*, we conclude that [the creditor] was being subjected to unequal treatment in violation of 11 U.S.C. § 1123(a)(4).

*Id.* at 1152 (emphasis added).

Unlike the plan to which the creditor objected in *AOV*, the instant plan provides recovery to Class IV(A) members without regard to whether they release their claims against the plan funders—in this case, the participating partners. Therefore, for purposes of § 1123(a)(4), Class IV(A) members receive the same treatment under the plan.

672

The objectors fail to distinguish between a partner's treatment under the plan on account of a claim or interest and treatment for other reasons. Only the former is governed by § 1123(a)(4). That test has been met. Class IV(A) members receive equal treatment under the plan.

The plan's provisions dealing with partner contributions, releases, and the permanent injunction have no connection to a partner's status as a claim or interest holder within a particular class. These provisions constitute a separate feature of the plan, designed to allow adequate funding of the plan. Every partner who wants to receive the protection of the permanent · injunction must agree to contribute to the plan and to release any claims against the other partners and creditors. This policy is applied to every partner without regard to his status as a claim or interest holder. As such, it does not constitute treatment of a claim of a particular class for purposes of § 1123(a)(4).

Different issues are raised by the objectors' complaints that the debtor deviated from the contribution amounts set by the allocation committee and required some partners to relinquish stronger defenses and claims than other partners. These complaints call into question the fairness of the allocation process and the good faith of the debtor in deviating from the contribution amounts. These issues are considered at length in Section IV, *infra.*

Before proceeding it should be noted that the above analysis (concluding that the complaints about the allocation process do not present § 1123(a)(4) issues) applies equally to any contention that the plan discriminates unfairly, or is not fair and equitable, with respect to Class IV(A), and therefore fails to meet the requirements of § 1129(b)(1).[5] This contention is based on allegations that in devising the allocation scheme, the debtor subordinated the interests of Class IV(A) to those of the majority.

These allegations go to the treatment of partners as a whole in the allocation process, governing what amount of contribution is necessary to be a funder of the plan and enjoy the benefits of an injunction, not the treatment of the claims or interests, placed in Class IV(A). These allegations call into question the good faith of the debtor in proposing the plan, not § 1123(a)(4) or § 1129(b)(1) issues. The plan is fair and equitable with respect to the dissenting Class IV(A) claims against and interests in the debtor's estate. The plan does not discriminate unfairly against Class IV(A) in comparison to other classes. These findings would apply even if each claim in Class IV(A) were a separate class and findings had to be made as to each of these classes.

III. *Fairness, Good Faith, and Equity of Plan Contribution Amounts*

The objectors have raised a multitude of arguments against finding that the plan was proposed in good faith. These arguments center on the process by which the debtor established a particular partner's contribution amount. Based on their complaints, the objectors maintain that the plan violates the good faith requirement found in § 1129(a)(3) and the standards for equitable relief under § 105(a). Section 105(a) concerns will be addressed in Section V, *infra.*

First, the objectors point to the basis for deriving the contribution amount. The contribution amount was based largely on the amount of compensation a partner received in 1989. The objectors assert that this basis is inadequate. They allege that 1989 was the debtor's worst year, and the partners who had benefitted the most in prior years received comparatively less compensation in 1989. At a minimum, in addition to 1989, compensation received in 1988 and 1987 should have been considered.

5. 11 U.S.C. § 1129(b)(1) provides:
Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

At an even more fundamental level, the objectors complain that the plan should not be based on compensation received, but should approximate the partners' liability under partnership law and in chapter 7. Thus, much criticism is directed at the plan's failure to attach adequate weight to a particular partner's available net worth. The objectors also criticize the plan for thwarting the understanding of the partners as embodied in the debtor's partnership agreement. They argue that the plan is defective because it fails to take into account the special defenses of the Class IV(A) members, in particular the defenses occasioned by the early withdrawal of various Class IV(A) members. A further defect cited by the objectors is the plan's failure to take management responsibility directly into account.

In their complaints the objectors focus on the allocation process. According to the objectors, the allocation committee arrived at an allocation formula which protected the interests of the majority at the expense of the minority. The objectors indicate the majority are those partners with high available net worths or management responsibility, and the Nelson & Harding partners who were P.C.s. The minority are those partners—all of whom are Class IV(A) members—who have special defenses because they withdrew from the partnership early. The objectors conclude that the net result is the assignment of plan contribution amounts that unfairly discriminate against the Class IV(A) members, instead of allocating liability in a fair and equitable manner.

The objectors further complain that the plan contribution amounts set by the allocation formula were not strictly adhered to by the debtor. The objectors aver that government relations specialists received discounts to their contribution amounts under the allocation formula. The objectors also point to those Class IV(A) members who negotiated settlements with the debtor that had no relationship to their respective contribution amounts. In addition, the objectors assert that the Nelson & Harding P.C. partners were allowed to satisfy their contribution amounts through their respec-

tive share of the proceeds from the Grain Case. According to the objectors, these deviations expose the allocation process as a purely political exercise in which the interests of the Class IV(A) objectors were unfairly subordinated to those of the majority. The objectors contend that such a process renders the allocation process arbitrary and, in turn, the plan unconfirmable.

 The standards applicable to determining whether a plan has been proposed in good faith are well established. First—

> [F]or purposes of determining good faith under section 1129(a)(3), ... *the important point of inquiry is the plan itself* and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code....

> According to the good faith requirement of section 1129(a)(3), the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code. The plan "must be 'viewed in light of the totality of the circumstances surrounding confection' of the plan [and] ... [t]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals."

*In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir.1984) (quoting *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir.1984) (quoting *Public Finance Corp. v. Freeman*, 712 F.2d 219, 221 (5th Cir.1983))) (emphasis added). The good faith standard requires "a showing that the plan was proposed with 'honesty and good intentions' and with a 'basis for expecting that a reorganization can be effected.'" *In re Koelbl*, 751 F.2d 137, 139 (2d Cir.1984) (quoting *Manati Sugar Co. v. Mock*, 75 F.2d 284, 285 (2d Cir. 1935)). "Full disclosure is the very essence of the obligation imposed by the requirement of good faith." *In re Cyr Bros. Meat Packing, Inc.*, 2 B.R. 620, 626 (Bankr. D.Me.1980). A plan proposed for ulterior motives fails to meet the good faith standard. *Koelbl*, 751 F.2d at 139.

The arguments the objectors pose implicate two distinct bases for criticizing the plan. First, the objectors raise concerns that are properly dealt with by looking at the objectors as creditors of the debtor. Second, the objectors question whether the process used to allocate contribution amounts was fair. The issues raised by this second basis can be analyzed only by viewing the objectors in their capacity as partners of the debtor facing claims of creditors against them individually.

### § 1129(a)(3) Objections from Creditor Perspective

In their capacity as creditors, the objectors maintain that the debtor could have produced a greater recovery for creditors by raising the contributions required of those partners with high available net worths. Similarly, the objectors question the debtor's good faith in settling with some partners at amounts at less than those set by the allocation committee.

■ The obvious response to these complaints is that the creditors voted overwhelmingly in favor of the plan. Of the 64 creditors voting—other than partners of the debtor—62 voted for the plan or roughly 97%. As noted by defendant's expert witness, Richard P. Schifter, a significant feature of the plan before the court is debt forgiveness by the creditors. The approval of the creditor body supports a finding that the plan was proposed in good faith and is consistent with the objectives and purposes of the Code.

■ The failure to place any substantial weight on available net worth in establishing contribution amounts does not amount to a lack of good faith in proposing the plan. Joel Rubin of the law firm of Arent Fox Kinter Plotkin & Kahn (Arent Fox) worked for the Creditors Committee as counsel during the period when the allocation amounts were derived. He testified that he reviewed the financial circumstances of the partners and negotiated with the debtor to arrive at a gross figure of contributions the Creditors Committee would find acceptable under a plan. The debtor's main concern in proposing the plan was to meet the figure set by the Committee. As the testimony of Edward Ruckert and Kermit A. Brashear makes evident, many partners felt that it was unfair effectively to penalize a partner for the happenstance of being wealthy, through inheritance or otherwise, when that had little to do with the debtor's financial failure, a failure that was more cogently addressed by other factors under the allocation formula. The debtor was attempting to reach a fragile coalition to assure that the gross figure demanded by the Creditors Committee was met. Any political process is by definition imperfect and from the perspective of creditors, is fair as long as the debtor is raising an amount that satisfies the demands of the vast creditor body.

According to the debtor's Second Amended Plan Funding Analysis, the debtor has raised $4,977,807.61 in contributions from partners alone. That figure does not include the value of the Kentucky land or the value of any proceeds from the Grain Case. The minimum amount for confirmation was $4.5 million, including $850,000.00 from the Grain Case and $75,000.00 from the Kentucky land. The $4.5 million figure was set by the creditors. The debtor has met that requirement.

Any additional amounts that might have been recovered by emphasizing available net worth would risk reducing the contributions from those partners with low available net worths. A significant feature of the plan is that many partners are contributing amounts greatly exceeding their available net worths. To expect them to be willing to contribute the same amounts in the face of partners with high available net worths being called upon to contribute more is purely speculative and contrary to the evidence that partners were persuaded that it was unfair to place heavy emphasis on available net worths. The delicate political balance the debtor achieved would be jeopardized by requiring the debtor to submit a new plan placing greater emphasis on net worth. In hindsight, the appointment of a trustee early on likely would have resulted in greater emphasis on available net worth and possibly could have resulted

in a higher aggregate recovery. But no partner or creditor requested such relief except incident to objecting to confirmation, and all creditors and partners were content to let the political process play out. To appoint a trustee now or to require the debtor to attempt to put forward a new plan would subject the estate to more administrative expenses with no assurance that a better plan would result.

 In addition, the court finds in Section IV, *infra,* that the "best interest of creditors" test has been met. This further supports a finding that the amount the plan raises for distribution is proffered in good faith, as does the court's finding of fact that the cram-down requirements in § 1129(b) have been met.

 The debtor's settlements with various partners for less than their contribution amount does not evidence bad faith. Once the debtor met the $4.5 million mark, it was fair for the debtor to settle to increase that gross figure. This maximizes the recovery to creditors who are spared the expense and time of litigating against these partners. That the debtor settled with some, but not with other, partners does not evidence bad faith. Where a partner may yield a high recovery, it makes sense not to settle but to litigate. Although settlement with some but not with others amounts to unequal treatment among partners, the debtor was not free to settle with each partner on terms agreeable to that partner. Instead, the debtor had to be sensitive to the demands of the creditors and focus on their interest in maximizing recovery to the estate. This is clearly consistent with the objectives implicit in the Code.

Close scrutiny of the individual settlements illustrate the debtor's sensitivity to the needs of the creditor body. The settlements reached with Hunter and Whittle were with two partners who had zero available net worths. Hunter and Whittle were also among those partners who were urging that they had defenses that were not

given appropriate weight in the allocation process. They are now effectively contributing $35,000 to the plan versus $70,551.61 under the allocation formula [6] and the court, with the Creditors Committee's strong endorsement and with the acquiescence of the only dissenting trade creditor that has objected to confirmation, allowed the amendment of the plan to reduce Hunter's and Whittle's allocated contribution amounts because of the perceived benefits to the estate of avoiding litigating with those two partners over confirmation issues, avoiding the economic expense of pursuing them for recovery and increasing the amount set to be received by way of contributions of participating partners. If Hunter and Whittle were kept outside the plan, creditors would face uncertainty and expense in seeking recovery from Hunter and Whittle who have zero available net worths. The plan provides for the Creditors Committee to pursue individual non-participating partners post-confirmation and reach settlements with them. The Creditors Committee urged this pre-confirmation settlement as part of the plan as being in the best economic interest of creditors, instead of deferring the issue for a post-confirmation resolution that might have risked loss of the effectively $35,000 in additional funds. (Of the $35,000, the sum of $15,000 is a reduction of attorney's fees by debtor's counsel who would have no reason to agree to that reduction after confirmation of the plan.) Thus, from the creditors' perspective it was not unfair to amend the plan to include contributions from Hunter and Whittle at reduced amounts.

The only other deviations from the allocation formula were really a wash because other partners agreed to make up the difference or the debtor's counsel agreed to forego fees in an amount sufficient to make up the difference. Thus, from a creditor's perspective, the plan was not unfairly compromised by these deviations from the allocation formula.

---

**6.** Hunter's allocated amount was $34,785.15; Whittle's was $35,766.46, for a total of $70,-551.61. Under the settlement Hunter and Whittle will each contribute $10,000 and the debtor' counsel will forego $15,000 of administrative fee claims against the estate.

*Partners' § 1129(a)(3) Objections from Perspective of Required Confirmation to Avoid Exposure to Creditor Claims*

At the same time the debtor was negotiating with the Creditors Committee as to how much had to be raised, the debtor was also negotiating with its members as to how to meet that figure. Based on the testimony of Kermit A. Brashear and Edward Ruckert, the court finds that the procedure followed in assigning allocation amounts was as fair as a democratic process can be. That the objectors fell in the minority is no basis for condemning the entire process. For purposes of good faith, what is important is that there is no evidence that either the partners as a whole or the allocation committee purposefully set out to discriminate against the dissenting Class IV(A) members.

Any discrimination that may have resulted from the allocation process was incidental to that process. From the testimony of Brashear and Ruckert, the court is satisfied that the debtor considered all relevant factors. Every partner had the opportunity to present a plan or to argue that certain factors should be utilized. That a majority of partners voted down a partner's proposal does not in itself evidence bad faith. The concept of majority rule is consistent with how a partnership does business. *See* D.C.Code Ann. § 41–117(8); Neb.Rev.Stat. § 67–318(h). As a practical matter, it was the only way to build the consensus necessary to meet the demands of the creditor body.

In addition, the objecting Class IV(A) members had the opportunity to complain to the court that the allocation process was unfair. No partner objected to proceeding with the debtor as a DIP in charge of allocating amounts to be contributed, nor did any partner object to the establishment of an allocation committee. Each partner could have moved the court to appoint a trustee or examiner based on a perceived inequity in the allocation process, but no partner did so until after the disclosure statement was approved and that motion has since been withdrawn. Each of these partners was perfectly satisfied to proceed, with the allocation committee in charge, in the hope of the committee allocating a satisfactory contribution amount.

In large part, the objectors' complaints are premised on the notion that the allocation process should have tracked the result in chapter 7 and under state law, where each partner would be liable for his available net worth. However, the whole purpose of utilizing chapter 11 is to avoid the results under chapter 7 or state law in favor of a more managed, less devastating resolution of the debtor's affairs. Thus, it is appropriate that the results in chapter 11 vary from those likely to occur in other circumstances. The only limitation imposed by the Code in this respect is that the net distribution to each creditor or interest holder be at least equal to that which would be received under chapter 7. This so-called "best interest" test of § 1129(a)(7) has been met, as is discussed in Section IV, *infra.*

In hindsight, a fairer result might have been achieved with the appointment of a chapter 11 trustee to negotiate with the partners individually. That would alleviate the dangers inherent in the democratic process. However, that is only hindsight. No showing has been made that a trustee would have arrived at a fairer result. It must also be pointed out that the appointment of a trustee could have resulted in litigation against many, if not all, partners. A trustee might have been viewed as an adversary in a manner detrimental to formulation of a plan. The expense that a trustee would entail was also avoided by proceeding with the debtor as a DIP charged with devising a plan based on consensus among the partners without the insertion into the negotiations of an outsider. In any event, the appointment of a trustee at this late date would result in great expense to the estate. Now, the court's concern is only whether, given the limitations of the democratic process, the allocation process was fair.

The court finds that the debtor made the allocation process as fair as can be expected. Any discrimination was reasonable. It resulted from the limitations inherent in

resolving a dispute by agreement, rather than litigation. The partners' circumstances and interests conflicted. The debtor was not free to negotiate as it pleased but had to satisfy a creditor body. Thus, the debtor was faced with catering to the creditor body while at the same time building consensus among the partners. The debtor has developed a plan overwhelmingly approved by the creditors and regarding which only one creditor and eight potential contributors pursue objections to confirmation.

Finally, no objecting partner is being forced to contribute more than his ultimate legal liability for partnership debt. The evidence indicates that the debtor's liabilities far exceed its assets, including the available net worths of the partners. The plan-allocated contribution amounts are not binding on non-participating partners, nor does the plan affect a partner's ability to raise defenses to creditor suits. Thus, if a partner believes his contribution amount exceeds his liability under partnership law, the partner is free to opt out of the plan and try his defenses. To the extent the objectors complain that the plan fails to preserve contribution rights, that complaint is more accurately directed at the plan's injunction, not the allocation of contribution amounts. To the extent the complaint does raise fairness concerns, those concerns are addressed in the context of the appropriateness of an injunction.

The plan is consistent with the objectives of the Code. It provides for the reorganization of the debtor into a entity that can be liquidated in an orderly manner while maximizing recovery by the creditors. In addition, the plan avoids the need for a liquidation under chapter 7 and the additional costs and time associated with such an endeavor. By building consensus instead of litigating, the debtor has fostered two of the primary objectives of Chapter 11—" 'the expeditious resolution of disputes and speedy payment to creditors.' " *In re Kemp,* 134 B.R. 413, 417 (Bankr. E.D.Cal.1991).

The court finds that the plan was proposed with honesty and good intentions,

with a basis for believing that it would fulfill its purpose, and with the full disclosure envisioned in the Code. The debtor has developed allocation amounts acceptable to the vast majority of its partners that meet the Creditor Committee's demands. The court has no reason to set aside the compromises embodied in the plan on the basis that the plan was not proposed in good faith.

■ The debtor's plan, however, includes the anomaly that participating partners will retain their rights for contribution against non-participating partners even though the non-participating partners will be barred by an injunction from suing the participating partners for contribution. The plan as presently drafted is unfair by any standard of fairness. The court will not discuss the issue at length, however, because the debtor's counsel assured the court that this was an oversight and agreed to take steps to redress this glitch by obtaining consents by the participating partners to being enjoined from pursuing the non-participating partners for contribution.

IV. *Best Interest of Creditors Test and Feasibility*

The objectors maintain that the plan fails to meet the "best interest of creditors" test embodied in § 1129(a)(7) and the feasibility test found in § 1129(a)(11). The objectors claim that the best interest test has not been met because of defects in the liquidation analysis performed by the debtor. First, they allege that the debtor failed to analyze partner transfers of property to determine whether there had been any fraudulent conveyances or other avoidable transfers.

The objectors further contend that the debtor's liquidation analysis improperly includes as being received under the plan a $532,500.00 amount attributable to the available net worths of non-participating partners. The objectors maintain that the creditors will receive these amounts through their independent actions, not through any plan provision.

The objectors next assert that the debtor's liquidation analysis includes as a recovery under the plan $425,000.00 to be received from the Grain Case. This amount is contingent and not yet collected. Accordingly, the objectors argue, the Grain Case should be valued at only $100,000.00, the value of the put the Nelson & Harding P.C. partners supplied the debtor. In any event, the objectors believe the Grain Case should be included on the liquidation side of the analysis.

The objectors also question whether Vistar Bank's security interest attaches to contributions from partners. If it does not, the objectors contend that the debtor should not have subtracted $377,889.00 from the total recovery in chapter 7. The debtor subtracted this amount because in chapter 7 Vistar Bank would not agree to look only to accounts receivable for payment, as the bank has agreed to do under the plan. Absent a valid security interest, the objectors argue, the bank is a general unsecured creditor without any right to be paid $377,889.00 before the other unsecured creditors receive distributions.

At a more basic level, the objectors question the validity of the financial statements used as the basis for the debtor's liquidation analysis. They note that the debtor never performed an independent verification of the statements' contents.

The objectors also allege that the plan is not feasible. They maintain that the debtor failed to establish that the participating partners had the ability to pay their respective contribution amounts. As justification for their concerns, the objectors point to the high contribution amounts undertaken by partners with low or zero available net worths. They further aver that some of the participant settlement notes were altered in a way that calls into question whether the signers will participate to their full assigned amount.

### A. "Best Interest of Creditors"

To satisfy the "best interest" test embodied in § 1129(a)(7), the debtor must show that a dissenting creditor will receive no less under the plan than it would have received in a chapter 7 liquidation. *Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988). The debtor relied on R. Glen Ayres, Jr., who was qualified as an expert witness, to establish that the best interest test had been met.

Ayres developed a liquidation analysis that compared the probable recovery to the creditors in chapters 7 and 11. His final figures indicated that $6,020,854.00 would be recovered in chapter 11 while only $5,026,611.00 would be recovered in chapter 7. On the plan side of the equation, he arrived at the following figures:

| | |
|---|---|
| Partner Contributions | $ 4,988,354.00 |
| Kentucky Land | + $ 75,000.00 |
| Grain Case | + $ 425,000.00 |
| 16 Non–Participating Partners | + $ 532,500.00 |
| Total | $ 6,020,854.00 |

The figure for contribution from partners consists of the contribution amounts pledged as of October 16, 1992, the date Ayres testified to his revised liquidation analysis. Accordingly, it includes amounts pledged by Earl J. Scudder, Charles C. Hunter, Patrick J. Whittle, and Thomas A. Rothwell. These partners agreed to contribute to the plan after the confirmation hearings had begun. Scudder, Hunter, and Whittle entered into settlements with the debtor and Rothwell agreed to pay his contribution amount in full. While, the amounts set forth for Scudder, Hunter and Whittle include $40,547.00 not pledged directly by those partners, the inclusion of the $40,547.00 is appropriate because it represents fees counsel for debtor has agreed to forego and additional contribution amounts assumed by other contributing partners. These adjustments were made as part of the debtor's settlements with Scudder, Hunter and Whittle.[7]

7. Hunter and Whittle's settlement also includes a $35,551.61 reduction in the amounts they are required to contribute. This amount has not been made up by other means but has been forgiven by the Creditors Committee. The court

stands by its former decision that this modification to the plan does not implicate 11 U.S.C. § 1127(c) because the modification "does not adversely change the treatment of the claim" of any creditor. *See* Fed.R.Bankr.P. 3019. The

The Kentucky land was contributed by the Nelson & Harding P.C. partners pursuant to negotiations with the Creditors Committee. These partners have guaranteed the dollar amount attributed to the land.

The Grain Case figure represents the proceeds expected from the final settlement of that case. Again, these proceeds were contributed by the Nelson & Harding P.C. partners pursuant to negotiations with the Creditors Committee. Under the plan, it has been assigned a value of $850,000.00. However, Ayres discounted that figure by 50% in keeping with his treatment of accounts receivable in his liquidation analysis. A feature of the Grain Case contribution is a $100,000.00 put whereby the Nelson & Harding P.C. partners have agreed to purchase $200,000.00 of the Grain Case's potential proceeds for $100,000.00.

The figure attributed to the 16 non-participating partners (mislabeled on debtor's exhibit O as "non-voting partners") represents their available net worths. It is included because, under the plan, the debtor's creditors will retain the ability to proceed against the non-participating partners, and thereby realize their available net worths.

On the liquidation side of the equation, Ayres arrived at the following figures:

| Proceeds from | |
|---|---|
| Liquidation of Partners | $4,449,500.00 |
| Administrative Fees | + $1,000,000.00 |
| Vistar Loan | − $ 377,889.00 |
| Interest on Vistar Loan | − $ 100,000.00 |
| Total | $5,026,611.00 |

The administrative fees figure represents the fees and expenses to date in the chapter 11 proceedings. These fees and expenses will have to be paid in either a chapter 11 or a chapter 7 scenario. They were subtracted out in arriving at the figure representing proceeds from liquidation of partners. They are added back in on the liquidation side of the equation to counter the failure to subtract them out on the plan side of the equation.

The amount subtracted out for the Vistar loan results from a feature of the plan by which Vistar Bank has agreed to look only to accounts receivable in satisfaction of $377,889.00 of the $1,493,540.00 for which it has a fully secured claim. Ayres characterized the $377,889.00 as "debt forgiveness." He indicated that this amount would have to be paid in full in chapter 7 before any distribution to the unsecured creditors.

The interest on the Vistar loan represents an estimate of the interest that would have to be paid on the super-priority Vistar loan while chapter 7 proceedings take place. Although the interest cannot be collected from the debtor in a chapter 7 case, 11 U.S.C. § 502(b)(2), the partners and guarantors would remain liable. The partners would be liable both derivatively as general partners and directly as personal guarantors. The Government Relations Specialists would remain liable on their personal guarantees. Vistar Bank would therefore be entitled to collect interest due from the personal estates of the partners and guarantors. This would, in turn, reduce the recovery of the chapter 7 trustee from those estates.

Ayres derived the figure for proceeds from liquidation of partners by determining what a chapter 7 trustee would receive if he proceeded against each partner under 11 U.S.C. § 723. In performing this exercise, Ayres assumed that each partner would file an individual chapter 7. Ayres then proceeded to liquidate each partner on paper. In each liquidation, Ayres based his analysis on the financial statements a particular partner supplied. For each partner, Ayres ultimately arrived at a high figure and a low figure that could be recovered in chapter 7. Ayres then added up the high figures and the low figures. From each

court based its decision on the savings in fees to the estate brought about by the withdrawal of Hunter's and Whittle's joint objection, reasoning that the savings in fees justified a finding that the $35,000.00 reduction did not adversely affect the claim of any creditor. In addition, by allowing Hunter and Whittle to participate in the plan, the overall plan contribution amounts were increased by $35,000, thus fixing the amount of contributions pre-confirmation instead of the Creditors Committee pursuing Hunter and Whittle post-confirmation for a recovery that the evidence has not shown would exceed $35,000.

total, he subtracted out a percentage for distributions to personal creditors of the partners, a percentage for chapter 7 trustee fees and for chapter 7 legal and accounting fees, and chapter 11 priority claims. Thus, Ayres ended up with a low figure of $3,821,000.00 and a high figure of $5,173,000.00. He then averaged these figures and came up with a figure of $4,497,000.00. From this figure, Ayres subtracted an additional $47,500.00 to arrive at a figure of $4,449,500.00, which is the number set forth in the chart above. The additional $47,500.00 was subtracted out because three partners originally included in the liquidation analysis have since filed "no-asset" chapter 7 bankruptcy cases or entered into direct settlements with the only creditors to whom they are liable, thus placing them beyond the reach of a chapter 7 trustee for the partnership.

Ayres testified that he did not make any independent verification of the financial statements prepared by the debtor's partners. The court finds this omission to be insufficient to warrant discounting the contents of the financial statements. The court admitted the financial statements into evidence under Rule 804(b)(5) of the Federal Rules of Evidence. As part of their financial statement packages, the partners included a sworn declaration as to the truthfulness of the statements. This declaration was specifically made under oath and penalty of perjury. In reaching its decision to admit the statements, the court took into account the Creditors Committee's possession of prior financial statements issued by the partners to banks incident to obtaining loans (when the partners would have had no likely incentive to underestimate their net worths) and the court found that the declarations submitted by an attorney under penalty of perjury supplied adequate circumstantial guarantees of trustworthiness. The court stands by its prior ruling.

Moreover, Jeffrey Barsky, a Certified Public Accountant, had been employed by the Creditors Committee to calculate the net worth of the partners. He testified that he examined the financial statements. In some instances, he compared them to other financial statements prepared by the partners and to federal tax returns. Barsky found the statements to be consistent and otherwise indicative of truthfulness.

The objectors' complaint that the debtor failed to do an independent fraudulent conveyance and avoidable transfer analysis is without real substance. Barsky stated that in reviewing the financial statements he was alert for transactions resulting in substantial changes in a partner's assets and for unusual fluctuations in assets and liabilities. Rubin testified that he reviewed the financial summary of the partners prepared by Barsky. In addition, Rubin testified that he and Barsky went over 20 financial statements selected for further examination because of problems with the information supplied. Rubin testified he went over the 20 financial statements line-by-line. Counsel for the Creditors Committee, Barsky, and counsel for debtor further examined the 20 statements and the financial summary prepared by Barsky in the context of negotiating the gross amount to be contributed by the partners under the plan.

Ayres also testified that from time to time he examined the partners' financial statements for fraudulent conveyances or avoidable transfers. He further testified that he did not do this in any systematic manner. Instead, Ayres said he relied on representations that Barsky and Rubin had examined the financial statements for fraudulent conveyances and avoidable transfers.

The court finds that the debtor's failure to undertake an extensive fraudulent conveyance and avoidable transfer analysis does not undermine the validity of the liquidation analysis. The Creditors Committee had every motivation to find any fraudulent conveyances and avoidable transfers. The great involvement the Creditors Committee had in the case coupled with the examinations of the financial statements by Barsky, Rubin, and Ayres assures the court that notwithstanding the lack of a systematic analysis the possibility of fraudulent transfers and avoidable transfers was adequately explored.

Any concrete evidence to the contrary is completely lacking. During cross-examination of Ayres the objectors hinted there may have been fraudulent conveyances or avoidable transfers. However, the objectors have not produced any independent evidence to that effect, nor have they otherwise established the probable existence of fraudulent conveyances or avoidable transfers. The objectors have had free access to the information the Creditors Committee gathered and have failed to point to a single instance where prior financial statements or tax returns raise a possible change in circumstances, in comparison to a partner's present financial picture, indicative of a possible fraudulent conveyance or otherwise avoidable transfer.

Similarly, the court finds that the objectors have produced no real evidence to counter Ayres's valuation of the Grain Case proceeds at $425,000.00. In attacking this valuation, the objectors rely exclusively on their cross-examination and oral argument. However, the cross-examination did not establish that the proceeds would be less than $425,000.00. At best, it established that the proceeds might be less. By the same token, the proceeds could be substantially more than the $850,000.00 value assigned to the Grain Case by the Creditors Committee in its negotiations with Nelson & Harding P.C. partners. The oral argument was no more convincing, based as it was on pure conjecture.

The objectors urge that the Grain Case should be included on the liquidation side as well as on the chapter 11 plan side of the liquidation analysis. The debtor responded in closing argument that the right to receive fees of $1,000,000 out of the Grain Case is held by a trust, the Nelson & Harding Merge Trust established when the debtor merged with Nelson & Harding, and that there are beneficiaries of that trust who are not former partners of the debtor. The court recalls no evidence to this effect and will not search its notes of the hearing to attempt to resolve this issue. The court will assume in favor of the objectors that

the Grain Case ought to be included on the liquidation side.[8]

When posited with that assumption, the explanation Ayres offered for not including the proceeds from the Grain Case in the amount received under chapter 7 is unconvincing. Ayres testified that a chapter 7 trustee, exercising § 723 powers, would abandon pursuit of that asset because he could not afford to wait for it to mature. However, the Grain Case must have some value and therefore a partner's interest in that case could be sold to someone who could afford to wait. The problem here is that no one provided any valuation of what the Grain Case would be if sold. For argument's sake, the court will assume the Grain Case would realize in a chapter 7 case the full $425,000.00 assigned to it by the debtor.

The court rejects the objectors' argument that the $532,000.00 to be collected under the plan from the non-participating partners should be excluded because received by independent creditor action, not by virtue of the plan. The purpose of the best interest test is to ensure that a dissenting member of an impaired class will be just as well off in a chapter 11 scenario as in a chapter 7 scenario. In either scenario, $532,000.00 will be available. It is included in the liquidation scenario and should be included in the plan scenario.

 Moreover, in applying the best interest test, the court should consider not only property received under the plan on account of a claim but also property "retain[ed] under the plan on account of such claim." 11 U.S.C. § 1129(a)(7)(A)(ii). This plan is unusual in that it forces creditors to relinquish their rights to proceed against the property of the participating partners. However, the plan preserves for creditors their rights—which exist because the debtor is in default—to proceed against the property of the non-participating partners. For this reason, the court believes that the creditors are effectively retaining the

---

**8.** In contrast, the Kentucky land was properly included on the chapter 11 side. Ayres already included the land on the liquidation side to the extent that it could be reached by creditors or a trustee.

$532,000.00 determined to be the available net worths of the non-participating partners. Thus, the court finds that the $532,000.00 is properly included as being received or retained under the plan.

Under the plan, the debtor has assigned its rights against the non-participating partners to the Creditors Committee. These rights include the right to contribution from partners should the debtor's liabilities exceed its assets. At state law, in settling accounts between partners on dissolution, the assets of the partnership include both partnership property and the contributions of the partner necessary for the payment of all partnership liabilities. D.C.Code Ann. § 41–139(1); Neb.Rev.Stat. § 67–340(a). As a result of the debtor's assignment, the Creditors Committee has the debtor's right to bring contribution actions on behalf of the debtor against the non-participating partners. Any amounts collected in such actions become property of the estate to be distributed under the plan. This mechanism protects those creditors whose claims are too small to warrant bringing their own actions.[9]

The right of the Creditors Committee to pursue non-participating partners is at least as extensive as the right of a chapter 7 trustee of the partnership to pursue § 723 claims. For this reason, the $532,000.00 properly is included in the liquidation analysis. Of course, § 723(a) is unavailable to a chapter 11 DIP, 11 U.S.C. § 103(b), and under § 1129(a)(7) a chapter 7 trustee's § 723 rights must be taken into account. *In re Arabians*, 103 B.R. 211, 216–17 (9th Cir. BAP 1989); *In re 222 Liberty Assocs.*, 108 B.R. 971, 987–89 (Bankr.E.D.Pa.1990). But the Creditors Committee's retention under the plan of the right, on behalf of the estate, to sue non-participating partners constitutes property received or retained under the plan for purposes of applying the best interest test of § 1129(a)(7) by comparing the chapter 11 results to a hypothetical chapter 7 case of a trustee exercising § 723 rights. The $532,000 amount must be discounted by any collection costs. But the $532,000 figure already includes the costs that would be charged as an administrative expense in the chapter 7 case of any partner. Although costs will be incurred in Creditors Committee suits, there is no evidence that they would significantly differ from the costs that a chapter 7 trustee of the partnership would incur in pursuing actions under 11 U.S.C. § 723 and in pursuing a claim in any chapter 7 case of the individual partner. Thus, the court concludes that the entire $532,000 ought to be included in the liquidation analysis.

Based on the foregoing, the aggregate liquidation analysis shows the property received under the plan exceeding the property received in a liquidation by at least $569,243:

| | | |
|---|---|---:|
| Aggregate Plan Proceeds | | $6,020,854 |
| Aggregate Liquidation Proceeds | | – $5,026,611 |
| | Total | $ 994,243 |
| Grain Case | | – $ 425,000 |
| | Net | $ 569,243 |

The court finds that Vistar Bank had a valid security interest in partner contributions of at least $377,889.00, and therefore the debtor correctly subtracted that amount from the liquidation proceeds. Vistar Bank's security interest attached to all of the debtor's assets, tangible or intangible, including after acquired property. The security agreement listed the following collateral, *inter alia*, as security for the bank's loans:

> general intangibles; choses in action ... rights to receive statutorily mandated contributions; all partnership property and partnership assets, as defined in the Uniform Partnership Act.

The court believes Vistar Bank's security interest probably covered the debtor's right to receive future contributions from partners to cover any partnership liabilities. On dissolution of a partnership, the part-

---

**9.** The court retains jurisdiction under § 105 to issue any appropriate injunctive relief necessary to ensure a fair distribution to the creditor body. Such relief may be appropriate if individual creditors, attempting to recover at the expense of the creditor body, thwart the Creditors Committee in its attempts to sue or negotiate with the non-participating partners on behalf of the creditor body.

nership has a right to contribution from its general partners if its liabilities exceed the value of partnership property. D.C.Code Ann. § 41–139(1); Neb.Rev.Stat. § 67–340(a). This right constitutes a chose in action. *See Black's Law Dictionary* 219 (5th ed. 1979).

As a general rule, a security interest in general intangibles includes choses in actions. *See* D.C.Code Ann. § 28:9–106; Neb.Rev.Stat.U.C.C. § 9–106. Where the parties include an after acquired property clause, inchoate choses in action are brought within the grasp of the security interest. *In re Bell Fuel Corp.*, 99 B.R. 602, 605–606 (E.D.Pa. *aff'd mem.*, 891 F.2d 281, 282 (3d Cir.1989)); *In re Boogie Enters., Inc.*, 79 B.R. 4 (C.D.Cal.1987); *Parker Roofing Co. v. Pacific First Fed. Sav. Bank*, 59 Wash.App. 151, 157–59, 796 P.2d 732, 735–36 (Wash.Ct.App.1990); *see also Christison v. United States*, 960 F.2d 613, 617 (7th Cir.1992); *In re Don Connolly Constr. Co.*, 110 B.R. 976, 978 (Bankr. M.D.Fla.1990). *But see Capital Nat'l Bank of New York v. McDonald's Corp.*, 625 F.Supp. 874, 878–79 (S.D.N.Y.1986) (security interest in general intangibles does not reach truly inchoate chose in action). In this regard, the parties' intent controls. *Parker Roofing*, 59 Wash.App. at 155, 157, 796 P.2d at 734, 735. The after acquired property clause evidences an intent to include inchoate choses of action as collateral. *See Bell Fuel*, 99 B.R. at 603; *Parker Roofing*, 59 Wash.App. at 159, 796 P.2d at 736. By the same reasoning, an after acquired property clause would extend a security interest's reach to inchoate contribution rights.

In any event, the court, by order entered October 17, 1991, gave Vistar Bank a super-priority security interest and lien in all collateral of the debtor for post-petition advances made to pay the estate's expenses. Order Approving Post–Petition Financing, at 8, 9. In the order, the items listed above were listed as collateral for post-petition financing. *Id.* at 2, 8. However, the rights and choses in action were no longer inchoate, the debtor having dissolved and filed bankruptcy. Thus, the bank has super-priority status with respect to its claim for post-petition advances. These advances exceed the $377,889.00 the debtor subtracted. Accordingly, the court finds that the debtor properly subtracted out that amount in arriving at the aggregate liquidation proceeds.

On this record, the assumption of Ayres that each partner will file bankruptcy in a liquidation context is reasonable. At a practical level, any other methodology would be highly speculative. Throughout the confirmation hearing the court posited a chapter 7 scenario in which the chapter 7 trustee would operate under § 723 with the protection of an injunction in much the same fashion as a chapter 11 trustee. In negotiating with the partners, the trustee would strike compromises as the partners attempted to avoid personal bankruptcies. However, these possibilities were never explored by the objectors. No evidence or argument was offered as to what such a scenario would yield and Ayres's analysis went unrebutted. The court is also aware that the dynamics in a chapter 7 case would be markedly different. The drive to consensus would be absent. The testimony of Brashear and Ruckert indicates that the partners negotiated among themselves in an effort to achieve a consensual result acceptable to the creditor body. Absent such cooperation, the court doubts whether a chapter 7 trustee would be able to approach the results achieved by the debtor under the plan. Moreover, a chapter 7 trustee would ordinarily pursue expeditious liquidation of the estate, a posture inimical to entering into delayed payment plans allowed by the plan here.

The court holds that the requirements of § 1129(a)(7) have been met. The court has evaluated the testimony of Barsky, Rubin, and Ayres and found it to be convincing and credible. The objectors put on no evidence to rebut Ayres' testimony, and thus his liquidation analysis stands unrebutted. Any shortcoming in Ayres testimony has been considered above. Even entertaining some assumptions in favor of the objectors, the court has determined that the plan will yield $569,243.00 more than would be recovered in a chapter 7 liquidation. Accord-

ingly, the court finds that the best interest test is met and that the requirements of § 1129(a)(7) have been satisfied.

### B. Feasibility

The feasibility test requires the court to evaluate " 'the probability of actual performance of the provisions of the plan.... The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.' " *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985) (quoting *In re Bergman*, 585 F.2d 1171, 1179 (2d Cir.1978) (citation omitted)). Success, however, need not be guaranteed; the test is "whether the plan offers reasonable assurances of success." *Johns–Manville*, 843 F.2d at 649.

The criticisms leveled by the objectors are insufficient to undermine the assurances of success inherent in the plan.[10] The partners have pledged their performance in notes easily enforceable at state law. The fact that many partners with low or zero net worths are making large contributions is one factor to consider. Equally important are a partner's ability to earn income in the future or other reserves of equity, such as jointly owned property or exempt property. The court finds that the participating partners are attorneys who were formerly partners in a law firm. As such they have a reasonable probability of earning substantial amounts of money in the future. The court further finds that many of the participating partners have substantial gross net worths to fall back on in the event their income stream is insufficient to meet their contribution obligations under the plan. The considered expert opinion of Ayres was that these partners would have considerable disincentives not to pursue bankruptcy cases of their own to avoid their commitments to make contributions: filing bankruptcy would dissolve their membership in any existing law partnership and would subject their credit record to the stigma of bankruptcy (albeit for

only 10 years in the case of credit transactions of less than $50,000). His unrebutted expert opinion was that the participating partners would in large measure make their contributions as called for by the plan, thus justifying a conclusion that $6,020,854.00 or close to it would be received under the plan in comparison to a hypothetical chapter 7 liquidation yielding only $5,541,611.00.

The objectors have not established that the participating partners will not be able to perform, but only raised that as a possibility. While such a possibility may prevent a finding that success under the plan is guaranteed, it does not prevent the court from finding that the plan provides reasonable assurances of success. Moreover, in accepting the plan, the creditors undoubtedly considered whether the participating partners would be able to perform their plan obligations. The creditors' conclusion that the partners could perform is not determinative, but counsels against rash assumptions based on worst case scenarios. In light of the evidence for a finding of feasibility and the dearth of evidence against such a finding, the court finds that the requirements of § 1129(a)(11) have been met.

### C. Altered Partnership Settlement Agreements and Notes

However, the objectors have pointed to certain partnership settlement agreements and notes that have been altered by interlineating proposed changes or striking paragraphs. Neither the court nor the debtor has accepted these agreements and notes. The debtor must inspect these agreements and notes and attempt to remedy any material alterations. Once it has done so, the debtor must file a motion to approve, including any necessary amendments, or reject the altered agreements or notes. This motion must be filed with the court by November 20, 1992. Responses must be filed by November 30, 1992.

---

**10.** The objection may be viewed as a § 1129(a)(7) objection that the projected plan recoveries will not actually be received such that the plan is not in the best interest of credi-

tors in comparison to a chapter 7 liquidation. But for simplicity's sake the objection will be addressed as a feasibility issue.

V. *The Permanent Injunction*

A. Power to Enter Permanent Injunction

The objectors contest the power of the court to enter a permanent injunction in this case. They assert that the terms of the injunction are inconsistent with the Code as the terms violate 11 U.S.C. § 524(e) by discharging non-debtors and 11 U.S.C. § 523 by insulating the participating partners from fraud claims. In addition, the objectors maintain that court lacks power to issue the injunction because such issuance would nullify the partners' state law rights to contribution and reimbursement or indemnification. *See* D.C.Code Ann.Ann. §§ 41–117, 41–139, 41–304; Neb. Rev.Stat. §§ 67–318, 67–340; Bromberg & Ribstein, *Partnership,* § 7.14 at 7:154 nn. 33–34 (1988 ed.).

■ Under section 105(a) a bankruptcy court may enter a permanent injunction enjoining suits against non-debtor parties funding a plan of reorganization if the court finds that such an injunction is essential to effectuate the plan of reorganization. *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 960 F.2d 285, 293 (2d Cir.1992); *Official Comm. of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines Inc.),* 928 F.2d 565, 574–75 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 82, 116 L.Ed.2d 55 (1991); *Menard–Sanford v. Mabey (In re A.H. Robins Co.),* 880 F.2d 694, 702 (4th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989); *MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 837 F.2d 89, 93–93 (2d Cir.), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988); *see In re Energy Coop., Inc.,* 886 F.2d 921, 929 (7th Cir.1989); *Unarco Bloomington Factory Workers v. UNR Indus., Inc.,* 124 B.R. 268, 279 (N.D.Ill.1990). As in *Menard–Sanford* and *Johns–Manville,* the estate's property interest in recovering from partners for the benefit of creditors, *see* D.C.Code Ann. § 41–138(1); Neb.Rev.Stat. § 67–340(a), constitutes a common pool for the benefit of creditors and injunctive relief to assure the maximization of that pool may be warranted.

In three recent cases similar to the instant case the United States Bankruptcy Court for the Southern District of New York issued orders confirming plans with injunctions similar to the injunction at issue in this case. *In re Laventhol & Horowath,* No. 90 B 13839 (Bankr.S.D.N.Y. Aug. 24, 1992); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,* No. 88 B 10377 (PBA) (Bankr. S.D.N.Y. Dec. 9, 1991); *In re Myerson & Kuhn,* No. 89 B 13346 (Bankr.S.D.N.Y. Oct. 1, 1991).

The bankruptcy court has broad powers under § 105(a):

> The Code ... states that bankruptcy courts may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Code. § 105(a). These statutory directives are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.

*United States v. Energy Resources Co.,* 495 U.S. 545, 549, 110 S.Ct. 2139, 2142, 109 L.Ed.2d 580 (1990) (citations omitted).

The objectors cite *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) and argue that the court lacks the authority to alter the rights of the debtor's partners at state law. *See also Johnson v. First National Bank of Montevideo, Minnesota,* 719 F.2d 270, 273–75 (8th Cir.1983), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). In *Butner,* the Court struck down a uniform federal rule of law that altered the property rights of a mortgagee as they existed at state law. The federal rule of law had been adopted and applied by certain federal circuit courts of appeals. In striking down the rule of law, the Court explained that "undefined considerations of equity provide no basis for adoption of a federal rule." *Butner,* 440 U.S. at 56, 99 S.Ct. at 918. The Court further noted that the federal rule did not serve "any identifiable federal interest." *Id.* at 55, 99 S.Ct. at 918.

In this case, the issuance of an injunction serves the federal interests underlying chapter 11. Indeed, the court finds below that these interests will be served only if an injunction is issued in this case. Thus, *Butner* is distinguished.

Moreover, the permanent injunction is not inconsistent with state law despite cutting off the contribution rights of the non-participating partners. Under state partnership law, the partners are required to contribute to losses sustained by the partnership. D.C.Code § 41–117(1); Neb.Rev. Stat. § 67–318(a). The dissolution of the partnership does not affect this liability. D.C.Code Ann. § 41–135(a); Neb.Rev.Stat. § 67–336(1). In settling accounts between partners after dissolution, a partner must contribute an amount necessary to satisfy the liabilities of the partnership. D.C.Code Ann. § 41–139(4); Neb.Rev.Stat. § 67–340(d). In any such accounting, any partner who pays more than his share of the liability has the right to seek contribution from his fellow partners. D.C.Code Ann. § 41–139(6); Neb.Rev.Stat. § 67–340(f). Notwithstanding this right of contribution, the creditors of the partnership have first priority with respect to each partner's assets. D.C.Code Ann. § 41–139(2); Neb. Rev.Stat. § 67–340(b).

The injunction is consistent with the law governing the settling of accounts between partners on dissolution of the partnership. By protecting the assets of the participating partners from contribution and other creditor suits, the injunction conserves the assets of the partnership available at state law to satisfy partnership debts. Further, the injunction facilitates the payment of creditors in an orderly manner and preserves the creditors' priority over the partners. If contribution rights were kept intact, contribution suits by non-participating partners would disrupt the plan's funding and distribution scheme. In addition, non-participating partners would be able to exercise rights against the participating partners, yet the exercise of superior rights would be denied partnership creditors. Such a result is inconsistent with state law. *See* D.C.Code Ann. § 41–139(2); Neb.Rev. Stat. § 67–340(b). Thus, the elimination of contribution rights fosters the proper allocation at state law of partnership resources, instead of frustrating that allocation. *Cf. In re Comark*, 53 B.R. 945, 947–48 (Bankr.C.D.Cal.1985) (issuing preliminary injunction in chapter 7 case).

Besides their rights of contribution, the objectors point to their rights of reimbursement or indemnification. To the extent the non-participating partners are only sureties or guarantors for partnership debts, they are entitled to be indemnified by the partnership for any payments made to satisfy partnership debts. Such reimbursement or indemnification rights are already governed by the Code. First, a distinction must be drawn between a former partner's claim for reimbursement or indemnification and his or her claim for contribution. The claim for contribution—dealt with in preceding paragraphs of this section—is a direct claim against co-partners. It arises by virtue of partnership law whenever a partner is called on to satisfy more than his fair share of partnership liability. As a contribution claim is a direct claim against non-debtor co-partners, not the debtor partnership, the Code provides no rules dealing with the resolution of a contribution claim. But, as the preceding discussion demonstrates, that does not bar an injunction against enforcement of such contribution claims against participating partners.

However, a claim for reimbursement or indemnification is a direct claim against the debtor partnership, not nondebtor co-partners. Resort to co-partners for contribution is necessary only if available partnership property, such as undistributed income, is insufficient to satisfy the reimbursement or indemnification claim. Thus, when a former partner asserts a reimbursement or indemnification claim in a partnership's bankruptcy case, his claim is against the debtor partnership, not the nondebtor co-partners. Accordingly, the Code expressly provides rules governing the resolution of a reimbursement or indemnification claim as a species of creditor claims.

Under the Code, a claim for reimbursement or indemnification, if allowed, is subordinated to the claim of the creditor paid

until that creditor's claim is paid in full. See 11 U.S.C. § 509(c); *In re Baldwin–United Corp.*, 55 B.R. 885, 895 (Bankr. S.D.Ohio 1985); *see also* 11 U.S.C. § 502(e) (governing allowance of claims for reimbursement and contribution). Further, even if the creditor's claim is satisfied, the claimant satisfying that claim has no special rights against the nondebtor partners. Instead, if the claimant's claim was allowed under § 502, the claimant has the rights established in the plan for such claims. Alternatively, if the claim is by way of subrogation under § 509(a), the claimant has only the satisfied creditor's rights under the plan. In either event, a claim for reimbursement or indemnification is not a claim directly against the nondebtor partners. Enjoining partners from pursuing derivative claims by way of subrogation to creditor's derivative claims against the participating partners is no different than enjoining creditors in general from pursuing derivative claims against participating partners.

Next, the objectors cite *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), for the proposition that the court's equitable powers under § 105 must be exercised consistently with the provisions of the Code. *See also In re Granger Garage, Inc.*, 921 F.2d 74, 77 (6th Cir.1990); *In re Plaza de Diego Shopping Ctr. Inc.*, 911 F.2d 820, 830–32 (1st Cir.1990); *First National Bank of Montevideo*, 719 F.2d at 273. The objectors maintain that the injunction is inconsistent with § 524(e) and § 523 of the Code.

■ Section 524(e) provides in relevant part that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." This section is merely declarative of the effect of a discharge under § 524. It does not affect the ability of the court to issue a permanent injunction under § 105(a) that affects the liability of a non-debtor on the debtor's debt. Such an injunction exists apart from a discharge under § 524. Section 524(e) contains no language of prohibition and should not be interpreted to limit the

court's power under § 105(a). *See Menard–Sanford*, 880 F.2d at 702. To the extent the court in *In re American Hardwoods, Inc.*, 885 F.2d 621, 625–627 (9th Cir.1989), holds that § 524(e) expressly limits the power of the court under § 105(a) this court respectfully disagrees. *See also In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 600–02 (10th Cir.1990), *modified sub nom., Abel v. West*, 932 F.2d 898 (10th Cir.1991); *In re Rohnert Park Auto Parts*, 113 B.R. 610, 615–616 (9th Cir. BAP 1990). Nothing in either the language of § 105(a) or § 524(e) mandates that result.

Similarly, the facts that led the *American Hardwoods* court to find relief under § 105(a) to be inconsistent with § 524(e) do not exist in this case. In *American Hardwoods*, the court reasoned that a discharge under § 524(a) and a permanent injunction under § 105(a) enjoining suits based on the debtor's debts were functionally the same. 885 F.2d at 626. In that case, nondebtor guarantors who were to be protected by a permanent injunction made no contributions to a plan of reorganization, nor did they undertake any other obligation to the creditors in place of their pre-bankruptcy obligations as guarantors. Thus, in the sense that the nondebtor guarantors were receiving the protection of the plan's injunction without making alternative arrangements for fulfillment of their contractual obligations, the nondebtors were receiving the functional equivalent of a discharge of their debt by virtue of the debtor's bankruptcy.

In this case, the nondebtors are receiving no such discharge. Instead, they are undertaking obligations to the creditors in place of their original obligations. These obligations provide the entire funding of the debtor's plan. The permanent injunction does not affect their liability on these substitute obligations. Thus, at a functional level the nondebtors are not receiving a discharge of their obligations to the creditors; they are merely exchanging one obligation for another. The exercise of the court's power under § 105(a) to issue an injunction therefore is not inconsistent with § 524(e). *American Hardwoods, supra, In re Western Real Estate Fund, supra,*

and *In re Rohnert Park, supra,* are thus distinguished from this case.

Moreover, in distinguishing *Menard–Sanford v. Mabey (In re A.H. Robins Co.), supra,* the *American Hardwoods* court emphasized that the reorganization before it did not contemplate the balancing of multiple claimants; that the permanent injunction was not overwhelmingly approved by the creditors; that the injunction would affect the largest creditor not just 1.5% of the creditors; and that there was no factual finding the permanent injunction was essential to the plan or that the entire reorganization hinged on it. 885 F.2d at 627. In this case, all of those conditions exist with the exception of the injunction affecting only a small percentage of creditors. However, where the creditors overwhelmingly approve the permanent injunction, and the largest creditor is included among those approving, the fact that the injunction affects a large percentage of creditors is relatively unimportant.

 The objectors contend that the exercise of § 105(a) powers here is inconsistent with § 523 because the permanent injunction insulates the participating partners from liability for fraud. Under § 523 such liability would be nondischargeable in a partner's bankruptcy case. *See In re Calhoun,* 131 B.R. 757 (Bankr.D.D.C.1991). The objectors point out that Earl H. Scudder, Jr., one of the debtor's former partners, filed a nondischargeability action based on fraud against Edward P. Taptich, another former partner, who had filed bankruptcy. Thus, they argue that the threat of fraud suits is more than just hypothetical.

At the outset, the court must note that it would never even consider approving a plan with a permanent injunction barring suits for fraud if there was any indication that the debtor and the participating partners had filed the plan in order to avoid such suits. After listening to testimony in extensive hearings, the court finds that there is no indication that the debtor filed the plan to avoid fraud suits.

Moreover, the objectors have produced no evidence of fraud other than the Scud-

der–Taptich matter. That matter has settled, and Scudder is among the partners participating under the plan. Scudder was a Nelson & Harding P.C. partner. Taptich was a. Heron Burchette partner before Nelson & Harding merged with Heron Burchette to form the present debtor. Scudder's fraud allegations were based on Taptich's role in inducing the merger. There is no evidence in the record that any Nelson & Harding P.C. partners are still outside the plan. In this decision, the court conditions confirmation of this plan on the participating partners waiving any suits against non-participating partners. Therefore, the threat posed by the Taptich–Scudder matter is no longer viable. In addition, there is no evidence that any creditor has any basis for bringing a fraud suit against non-participating partners. If a creditor had such a basis, the creditor would have a fraud claim against participating partners as well regardless of the innocence of any participating partners. *Calhoun,* 131 B.R. at 760–63. Such a creditor would have had an incentive to object to confirmation on the basis that the plan infringes on the creditor's right to pursue partners forever, even if they received a discharge in their bankruptcy cases, based on § 523. Not one creditor raised such an objection.

Thus, the issue boils down to whether the hypothetical threat of fraud is sufficient to derail the confirmation of the debtor's plan. The court finds that it is not. Although the debtor bore the ultimate burden of establishing that confirmation was consistent with the Code, it was incumbent upon the objectors to show that their complaints had some basis in fact. The Scudder–Taptich matter has settled and there is no indication that there is any basis for otherwise alleging fraud. The objectors protest that there is no evidence of fraud because the court's preliminary injunction precluded any suits. Nothing, however, prohibited the objectors from producing evidence of fraud during the confirmation hearings. On these facts, it is inappropriate to deny confirmation of the plan because it is inconsistent with § 523.

If the hypothetical threat of fraud is sufficient to warrant denial of confirmation, a plan like the one before the court can never be confirmed. Similar plans have been confirmed in the Bankruptcy Court for the Southern District of New York and similar injunctions have been approved. In accord with those cases, cited above, this court holds that it has the power under § 105(a) to issue the permanent injunction on which this plan is conditioned.

B. Equities of Entering Permanent Injunction

The objectors argue that should the court determine that it has power under § 105(a) to issue the permanent injunction, the court should nevertheless decline to exercise that power because of the equities involved in this case.

The objectors assert that the permanent injunction leaves the non-participating partners liable for all the partnership debts and without recourse to the participating partners who are liable at state law for contribution. This result frustrates the partners' understanding in forming a partnership that they would be able to obtain contribution from their fellow partners.

The objecting non-participating partners further assert that they are only sureties for partnership debts. Therefore they are only secondarily liable with a right of reimbursement or indemnification against the partnership and its members.

The court finds that the injunction is necessary to the debtor's reorganization. The debtor produced testimony from Brashear, Ruckert, and Cheryl C. Burke, another participating partner, to the effect that they would not participate absent the permanent injunction's protection. These participating partners testified that they would have no incentive to contribute the large sums of money called for under the plan if they were open to creditor suits and inter-partner contribution suits despite contributing under the plan.

The injunction is the *sine qua non* of the debtor's reorganization. Without it, the debtor would not be able to produce a workable plan of reorganization. The debt-or would not be able to marshal its available assets in an orderly, expeditious manner. The debtor would not be able to maximize the distribution to the creditors. Instead, the debtor would be forced into chapter 7. This would be a waste of resources. Litigation would be rampant. There would be the race to the courthouse the Code strives to eliminate (unless the court were to issue in favor of the chapter 7 trustee the type of injunctive relief the objectors contend should not be granted incident to a chapter 11 plan).

Many smaller creditors would undoubtedly be unable to pursue their claims as the costs would be too high. They would receive no distributions at all. The Code's policy of "maximizing return on a collective basis to all creditors" would be thwarted.

Based on the foregoing, the court finds that the permanent injunction is necessary to achieve maximum distribution to all the debtor's creditors. Moreover, the court finds that absent an injunction no plan would be confirmable as the issuance of the injunction is a condition precedent to confirmation.

The court further finds that the non-participating partners are not substantially harmed by the issuance of the injunction. Their claims for contribution and reimbursement or indemnification are essentially worthless in the non-plan context as the debtor's total assets, including the available net worths of the partners, are insufficient to satisfy the creditors' claims. In addition, notwithstanding the issuance of a permanent injunction, the non-participating partners retain their defenses to liability for the debtor's debt.

The objectors assert that it is unfair to protect the participating partners while leaving the non-participating partners open to full liability for partnership debt. In making this argument, the objectors forget that their interests are not the only interests at stake. The interests of the creditor body must be considered. The creditors have approved the plan. This indicates they are reasonably satisfied with the result reached in the plan. Their will should

not be defied when the court finds that the non-participating partners would be no better off without the plan than with it.

Finally, the objectors contend that it is inequitable to expose them to potential liability for the fraud of another partner. Under *Calhoun,* 131 B.R. at 760–63, they can be held liable for the full extent of the fraud even if they are innocent.

The court agrees that such a result would be inequitable. However, no evidence has been cited indicating that such a result is likely. Thus, the court is faced with weighing the potential for harm to the objectors if the injunction is issued against the potential for harm to every other interested party to this bankruptcy case if the injunction is issued. As there has been no showing that there is a realistic possibility of fraud, the court finds that the potential for harm to the objectors is minimal. As the court has found that a plan cannot be confirmed without an injunction and that absence of a confirmed plan will thwart the policies of the Code, the potential for harm to the other parties is great. Accordingly, the court finds that the injunction should be issued notwithstanding the possibility of fraud.

In short, the evidence shows that granting the injunction is in the best interest of the debtor's estate and its creditors and will promote the orderly administration of this case and the implementation of the plan in accordance with chapter 11 of the Code. Therefore, in the event the court confirms the debtor's plan, the court will grant the relief requested by the debtor in its complaint filed in the adversary proceeding presently at issue.

The injunction will be issued incident to the plan confirmation process but will not be included only in an order of confirmation. The court required the debtor to pursue any injunctive relief incident to confirmation by way of the adversary proceeding in which it has obtained a preliminary injunction. Under F.R.Bankr.P. 7001(7), the court may issue an injunction only in an adversary proceeding. (Under F.R.Bankr.P. 7001(8), in contrast, subordination of a claim or interest may be ob-

tained by way of a plan or by way of an adversary proceeding.) Accordingly, the adversary proceeding and the confirmation hearing have been tried together, with notice to all non-defaulting defendants in the adversary proceeding of the final injunction hearing. This was done to obviate any future objection that creditors cannot be enjoined by only a confirmed plan in which the debtor has included an injunction provision. *See Union Carbide Corp. v. Newboles,* 686 F.2d 593 (7th Cir.1982). Here each creditor was served with a summons and complaint specifically apprising them of the injunctive relief sought. They were not simply served with a plan dealing with the disposition of the debtor's estate, a subject to which they might not care to devote sufficient attention to realize that an injunction was sought.

## CONCLUSION

Confirmation of the debtor's plan and entry in the related adversary proceeding of the requested injunction shall await classification of (1) whether participating partners consent to being enjoined from pursuing non-participating partners, (2) whether participating class IV(A) partners consent to amendment of the debtor's plan to receive any distribution pro rata with non-participating Class IV(A) partners, and (3) whether the alternative of participation agreements or notes present any obstacle to confirmation. By December 7, 1992, the debtor shall obtain any consents by participating partners in the form of a waiver in substantially the form proposed by the debtor and approved by the court at a hearing held on November 16, 1992. A further hearing on confirmation will be held on December 11, 1992 at 10:30 a.m.